1  MARY E. ALEXANDER, ESQ. (SBN: 104173)
2  Mary Alexander & Associates, P.C.
   44 Montgomery Street, Suite 1303
3  San Francisco, California 94104
   Telephone:  (415) 433-4440
4  Facsimile:  (415) 433-5440
   Email:  malexander@maryalexanderlaw.com
5
6  ELIZABETH J. CABRASER (SBN: 083151)
   Lieff Cabraser Heimann & Bernstein, LLP
7  275 Battery Street, 29th Floor
   San Francisco, CA 94111-3339
8  Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
9  Email:  ecabraser@lchb.com
10
   GRETCHEN NELSON (SBN: 112566)
11 Nelson & Fraenkel LLP
   601 So. Figueroa Street, Suite 2050
12 Los Angeles, CA 90017
   Telephone:  (213) 622-6469
13 Facsimile:  (213) 622-6019
   Email:  gnelson@nflawfirm.com
14
15 *Attorneys for Plaintiffs*
   [Additional counsel on signature page]
16

17                    UNITED STATES DISTRICT COURT

18                   CENTRAL DISTRICT OF CALIFORNIA

19

20 | ROBERT ARCHER; MARLENE | Case No.:  2:20-cv-04203-RGK |
   ARCHER; JACQUELINE GRAHAM;
21 ROBERT GRAHAM; PAMELA GIUSTI;      **THIRD AMENDED CLASS**
   MICHAEL GIUSTI; VALERIE            **ACTION COMPLAINT FOR**
22 PASQUINI WILLSEA; MICHAEL R.       **DAMAGES**
   NEKY; GINA M. PALLOTTA; JOSEPH
23 CLARK; VIOLA CLARK; JEFFREY
   SKINNER; BRENDA SKINNER; RAUL      1.  NEGLIGENCE
24 PANGILINAN; DENCY PANGILINAN;      2.  GROSS NEGLIGENCE
   ARLINDA PANGILINAN; RIZALINA       3.  NEGLIGENT INFLICTION OF
25 RUNAS; MARISSA SMITH; JULIAN           EMOTIONAL DISTRESS
   SMITH; PATRICIA MCFADDEN;          4.  INTENTIONAL INFLICTION OF
26 ALLEN MCFADDEN; GLORIA                 EMOTIONAL DISTRESS
   PRESLEY; JESSE PRESLEY; JANIE
27 HARRISON; JULIE PHILLIPS; MARIA

   *[Caption continued on following page]*   **DEMAND FOR JURY TRIAL**
28

MAGOS; RAYMOND PENA; JOHN
BEKHAZI; MIRNA BEKHAZI; NANCY
ALVIS; LEONARD OWEN; DOROTHY
OWEN; CHARLES NURRE; LEIGH
NURRE; AMY ROTHMAN; JORDAN
BLYNN; GENE QIN; DIANA GONG;
GARY PILGRAM; SHARON
PILGRAM; SAMUEL ARREAGA;
HILDA ARREAGA; DAVID CHEN;
JEAN CHEN; KATHERINE HINTON;
NORMA BERKOWITZ; DEBRA
LEONELLI; DAVID REGE; ROSANNE
EADS; BILL J. EADS, SR.; EDNA
PELAYO; NICHOLAS ALLEN; ANNA
ALLEN; SUZANNE SUWANDA;
JOSEPH BALLIN; VICTORIA BALLIN,
DAVID LEANDRES, DIANNE
LEANDRES, GURVINDER BHASIN,
HARVINDER BHASIN, PATRICIA
MCGINNIS, and MARITESS MILLER,
on behalf of themselves and all others
similarly situated,

       Plaintiffs,

   vs.

CARNIVAL CORPORATION;
CARNIVAL PLC and PRINCESS
CRUISE LINES LTD.,

       Defendants.

## **COMPLAINT AND JURY DEMAND**

Individual and representative Plaintiffs ROBERT ARCHER, MARLENE

ARCHER, PAMELA GIUSTI, MICHAEL GIUSTI, JACQUELINE GRAHAM,

ROBERT GRAHAM, VALERIE PASQUINI WILLSEA, MICHAEL R. NEKY,

GINA M. PALLOTTA, JOSEPH CLARK, VIOLA CLARK, RAUL

PANGILINAN, DENCY PANGILINAN, AMY ROTHMAN, JORDAN BLYNN,

JOSEPH BALLIN, VICTORIA BALLIN, DAVID LEANDRES, AND DIANNE

LEANDRES, bring this action for themselves and on behalf of all persons similarly

situated, including individual Plaintiffs JEFFREY SKINNER, BRENDA

SKINNER, ARLINDA PANGILINAN, RIZALINA RUNAS, MARISSA SMITH,

JULIAN SMITH, PATRICIA MCFADDEN, ALLEN MCFADDEN, GLORIA PRESLEY, JESSE PRESLEY, JANIE HARRISON, JULIE PHILLIPS, MARIA MAGOS, RAYMOND PENA, JOHN BEKHAZI, MIRNA BEKHAZI, NANCY ALVIS, LEONARD OWEN, DOROTHY OWEN, CHARLES NURRE, LEIGH NURRE, GENE QIN, DIANA GONG, GARY PILGRAM, SHARON PILGRAM, SAMUEL ARREAGA, HILDA ARREAGA, DAVID CHEN, JEAN CHEN, KATHERINE HINTON, NORMA BERKOWITZ, DEBRA LEONELLI, DAVID REGE, ROSANNE EADS, BILL J. EADS, SR., EDNA PELAYO, NICHOLAS ALLEN, ANNA ALLEN, SUZANNE SUWANDA, GURVINDER BHASIN, HARVINDER BHASIN, PATRICIA MCGINNIS, and MARITESS MILLER, and the more than 2,000 passengers who sailed on the roundtrip Motor Vessel ("M/V") GRAND PRINCESS cruise from San Francisco, California on February 21, 2020, to Hawaii, against Defendants, PRINCESS CRUISE LINES LTD. ("PRINCESS"), its parent companies CARNIVAL CORPORATION & CARNIVAL PLC (collectively, "CARNIVAL") and allege:

## **THE PARTIES**

1.      Individual and representative Plaintiff Robert Archer is *sui juris*, and is a resident of San Francisco County, California and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

2.      Individual and representative Plaintiff Marlene Archer is *sui juris*, and is a resident of San Francisco County, California and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

3.      Individual and representative Plaintiff Pamela Giusti is *sui juris*, and is a resident of San Mateo County, California and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

4.     Individual and representative Plaintiff Michael Giusti is *sui juris*, and is a resident of San Mateo County, California and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

5.     Individual and representative Plaintiff Valerie Pasquini Willsea is *sui juris*, is a resident of San Mateo County, California and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

6.     Individual and representative Plaintiff Michael R. Neky is *sui juris*, is a resident of Stanislaus County, California and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

7.     Individual and representative Plaintiff Gina M. Pallotta is *sui juris*, is a resident of Stanislaus County, California and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

8.     Individual and representative Plaintiff Joseph Clark is *sui juris*, and is a resident of Stanislaus County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

9.     Individual and representative Plaintiff Viola Clark is *sui juris*, and is a resident of Stanislaus County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

10.    Individual and representative Plaintiff Raul Pangilinan is *sui juris*, and is a resident of Contra Costa County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

11.     Individual and representative Plaintiff Dency Pangilinan is *sui juris*, and is a resident of Contra Costa County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

12.     Individual and representative Plaintiff Amy Rothman is *sui juris*, and is a resident of Queens County, New York and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

13.     Individual and representative Plaintiff Jordan Blynn is *sui juris*, and is a resident of Queens County, New York and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

14.     Individual and representative Plaintiff Joseph Ballin is *sui juris*, and is a resident of Stone County, Missouri and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

15.     Individual and representative Plaintiff Victoria Ballin is *sui juris*, and is a resident of Stone County, Missouri and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

16.     Individual and representative Plaintiff David Leandres is *sui juris*, and is a resident of Washington County, Oregon and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

17.     Individual and representative Plaintiff Dianne Leandres is *sui juris*, and is a resident of Washington County, Oregon and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

18.     Individual and representative Plaintiff Jacqueline Graham is *sui juris*, and is a resident of San Francisco County, California and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

19.     Individual and representative Plaintiff Robert Graham is *sui juris*, and is a resident of San Francisco County, California and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

20.     Individual Plaintiff Jeffrey Skinner is *sui juris*, is a resident of Sacramento County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

21.     Individual Plaintiff Brenda Skinner is *sui juris*, is a resident of Sacramento County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

22.     Individual Plaintiff Arlinda Pangilinan is *sui juris*, is a resident of San Joaquin County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

23.     Individual Plaintiff Rizalina Runas is *sui juris*, is a resident of San Joaquin County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

24.     Individual Plaintiff Marissa Smith is *sui juris*, is a resident of Bernalillo County, New Mexico and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

25.     Individual Plaintiff Julian Smith is *sui juris*, is a resident of Barnalillo County, New Mexico and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

26.     Individual Plaintiff Patricia McFadden is *sui juris*, is a resident of Solano County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

27.     Individual Plaintiff Allen McFadden is *sui juris*, is a resident of Solano County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

28.     Individual Plaintiff Gloria Presley is *sui juris*, is a resident of Contra Costa County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

29.     Individual Plaintiff Jesse Presley is *sui juris*, is a resident of Contra Costa County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

30.     Individual Plaintiff Janie Harrison is *sui juris*, is a resident of Solano County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

31.     Individual Plaintiff Julie Phillips is *sui juris*, is a resident of Antelope County, Nebraska and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

32.     Individual Plaintiff Maria Magos is *sui juris*, is a resident of Fresno County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

1    33.    Individual Plaintiff Raymond Pena is *sui juris*, is a resident of Fresno

2    County, California and was a passenger onboard the M/V GRAND PRINCESS

3    cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

4    34.    Individual Plaintiff John Bekhazi is *sui juris*, is a resident of Benton

5    County, Washington and was a passenger onboard the M/V GRAND PRINCESS

6    cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

7    35.    Individual Plaintiff Mirna Bekhazi is *sui juris*, is a resident of Benton

8    County, Washington and was a passenger onboard the M/V GRAND PRINCESS

9    cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

10    36.    Individual Plaintiff Nancy Alvis is *sui juris*, is a resident of Klamath

11    County, Oregon and was a passenger onboard the M/V GRAND PRINCESS cruise

12    from February 21, 2020, to disembarkation on or about March 10, 2020.

13    37.    Individual Plaintiff Leonard Owen is *sui juris*, is a resident of Contra

14    Costa County, California and was a passenger onboard the M/V GRAND

15    PRINCESS cruise from February 21, 2020, to disembarkation on or about March

16    10, 2020.

17    38.    Individual Plaintiff Dorothy Owen is *sui juris*, is a resident of Contra

18    Costa County, California and was a passenger onboard the M/V GRAND

19    PRINCESS cruise from February 21, 2020, to disembarkation on or about March

20    10, 2020.

21    39.    Individual Plaintiff Charles Nurre is *sui juris*, is a resident of

22    Sacramento County, California and was a passenger onboard the M/V GRAND

23    PRINCESS cruise from February 21, 2020, to disembarkation on or about March

24    10, 2020.

25    40.    Individual Plaintiff Leigh Nurre is *sui juris*, is a resident of

26    Sacramento County, California and was a passenger onboard the M/V GRAND

27    PRINCESS cruise from February 21, 2020, to disembarkation on or about March

28    10, 2020.

41.    Individual Plaintiff Gene Qin is *sui juris*, is a resident of San Francisco County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

42.    Individual Plaintiff Diana Gong is *sui juris*, is a resident of San Francisco County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

43.    Individual Plaintiff Gary Pilgram is *sui juris*, is a resident of Marin County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

44.    Individual Plaintiff Sharon Pilgram is *sui juris*, is a resident of Marin County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

45.    Individual Plaintiff Samuel Arreaga is *sui juris*, is a resident of San Joaquin County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

46.    Individual Plaintiff Hilda Arreaga is *sui juris*, is a resident of San Joaquin County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

47.    Individual Plaintiff David Chen is *sui juris*, is a resident of San Mateo County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

48.    Individual Plaintiff Jean Chen is *sui juris*, is a resident of San Mateo County California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

49.     Individual Plaintiff Katherine Hinton is *sui juris*, is a resident of Napa County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

50.     Individual Plaintiff Norma Berkowitz is *sui juris*, is a resident of Nevada County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

51.     Individual Plaintiff Debra Leonelli is *sui juris*, is a resident of San Francisco County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

52.     Individual Plaintiff David Rege is *sui juris*, is a resident of San Francisco County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

53.     Individual Plaintiff Rosanne Eads is *sui juris*, is a resident of Placer County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

54.     Individual Plaintiff Bill J. Eads, Sr. is *sui juris*, is a resident of Placer County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

55.     Individual Plaintiff Edna Pelayo is *sui juris*, is a resident of San Joaquin County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

56.     Individual Plaintiff Nicholas Allen is *sui juris*, is a resident of San Mateo County, California and was a passenger onboard the M/V GRAND

PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

57.     Individual Plaintiff Anna Allen is *sui juris*, is a resident of San Mateo County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

58.     Individual Plaintiff Suzanne Suwanda is *sui juris*, is a resident of Santa Clara County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

59.     Individual Plaintiff Gurvinder Bhasin is *sui juris*, is a resident of Alameda County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

60.     Individual Plaintiff Harvinder Bhasin is *sui juris*, is a resident of Alameda County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

61.     Individual Plaintiff Patricia McGinnis is *sui juris*, is a resident of Clackamas County, Oregon and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

62.     Individual Plaintiff Maritess Miller is *sui juris*, is a resident of Maricopa County, Arizona and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

63.     Defendant CARNIVAL CORPORATION was incorporated in 1972 in Panama and has its headquarters in Miami, Florida.

1      64.   Defendant CARNIVAL PLC was incorporated in 2000, in Wales,

2  United Kingdom. It also has its headquarters in Miami, Florida.

3      65.   Upon information and belief, Defendant PRINCESS CRUISE LINES

4  LTD. is incorporated in Bermuda, with its headquarters in Santa Clarita, California.

5      66.   Upon information and belief, at all times hereto, CARNIVAL

6  CORPORATION, CARNIVAL PLC, and PRINCESS advertised, marketed, sold,

7  and profited (directly or indirectly) from and owned, controlled, and operated the

8  cruise ship, M/V GRAND PRINCESS.

9                  **ALTER EGO/PIERCING CORPORATE VEIL**

10     67.   Defendants CARNIVAL CORPORATION, CARNIVAL PLC, AND

11  PRINCESS are alter egos and/or agents of each other such that the corporate form

12  should be disregarded.

13     68.   CARNIVAL CORPORATION and CARNIVAL PLC operate as a

14  single economic enterprise. They share a senior executive management team and

15  identical Boards of Directors. Both CARNIVAL CORPORATION and

16  CARNIVAL PLC share a single headquarters in Miami, Florida. They are one and

17  the same.

18     69.   As described by CARNIVAL CORPORATION in a filing with the

19  Securities and Exchange Commission ("SEC"), "Carnival Corporation and Carnival

20  plc operate a dual listed company ('DLC'), whereby the businesses of Carnival

21  Corporation and Carnival plc are combined through a number of contracts and

22  through provisions in Carnival Corporation's Articles of Incorporation and By-

23  Laws and Carnival plc's Articles of Association."

24     70.   Plaintiff brings this lawsuit against CARNIVAL CORPORATION and

25  CARNIVAL PLC individually, but because the entities work as alter-egos and/or

26  agents of one another, Plaintiff refers to them collectively throughout this

27  Complaint as "CARNIVAL."

28

THIRD AMENDED COMPLAINT
No. 2:20-cv-04203-RGK

71.     In the same SEC filings in which CARNIVAL explains the DLC, it also claims a portfolio of cruise brands which it breaks into two segments (1) the North America Segment, which includes PRINCESS, and (2) the Europe Australia and Asia Segment. CARNIVAL represents that, with these two segments, it "operate[s] over 100 cruise ships within a portfolio of leading global, regional and national cruise brands." CARNIVAL further provides details as to the passenger capacity of each of its subsidiary brands, and each brand's respective percentage of the total capacity of CARNIVAL CORPORATION.

72.     CARNIVAL thus represents to the public that it can properly claim the revenues, income, earnings, assets, carrying capacity, employees and vessels operating as PRINCESS CRUISE LINES.

73.     CARNIVAL exercises total domination over PRINCESS, to the extent that Princess manifests no separate corporate interests of its own and functions solely to achieve the purposes of CARNIVAL.

a.     CARNIVAL and PRINCESS share the same Board of Directors and almost all of the same executive officers, and CARNIVAL and PRINCESS also appear to use the same assets, including the vessel that is the subject of this Complaint.

b.     In fact, in past SEC filings, CARNIVAL has claimed the M/V GRAND PRINCESS as one of its assets. CARNIVAL represents that the M/V GRAND PRINCESS is one of its vessels for the purposes of aggregating CARNIVAL's own worth, financial condition and abilities to the public and in business dealings, allowing it to leverage this value for its own benefit.

c.     CARNIVAL's Group Senior Vice President and Chief Medical Officer, Dr. Grant Tarling, also serves as the Chief Medical Officer for each of CARNIVAL's cruise line brands. In this role, Dr. Tarling provided multiple messages to the public on behalf of PRINCESS and CARNIVAL through YouTube and Facebook, regarding the status of the M/V DIAMOND PRINCESS and about

safety measures PRINCESS and CARNIVAL claimed to implement on PRINCESS ships.[1]

     d.    CARNIVAL also claims for itself all of PRINCESS's purported rights, exemptions from liability, defenses, and immunities included in PRINCESS's Passage Contract, despite not being a signatory to the Passage Contract.

     e.    CARNIVAL determines the bonuses paid to executives of its cruise line brands, including PRINCESS, through its Management Incentive Plan. Bonuses paid to executives of CARNIVAL's cruise line brands are determined both by whether the executive's cruise line brand met its "Brand Operating Income Target" and by whether CARNIVAL met its company-wide "Corporation Operating Income Target."

     f.    CARNIVAL promulgated Health, Environmental, Safety, and Security (HESS) policies for all of its cruise line brands, including PRINCESS. CARNIVAL's HESS Corporate Policy states that CARNIVAL will "ensure compliance with this [HESS] policy within each of Carnival's Corporate and Operating Line organizations."[2]

     g.    In 2018, CARNIVAL implemented a HESS event reporting platform to "standardize HESS event reporting and analysis capabilities across our entire fleet."[3]

---

[1] *See*, *e.g.*, Diamond Princess Update: Dr. Grant Tarling, February 13, 2020, https://www.facebook.com/PrincessCruises/videos/203765767439746/ (last visited August 14, 2020); Dr. Grant Tarling Medical Update with Enhanced Screening and Preventive Health Measures, February 29, 2020, https://www.youtube.com/watch?v=kSOuXwmh9Lo (last visited August 14, 2020).

[2] Carnival Corporation & PLC Health, Environmental, Safety, Security, and Sustainability Corporate Policy, https://www.carnivalcorp.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited September 30, 2020).

[3] Sustainability from Ship to Shore, Carnival Corp. & PLC FY2018 Sustainability Report, https://safety4sea.com/wp-content/uploads/2019/06/Carnival-Corp.-Sustainability-From-Ship-to-Shore-2019_06.pdf (last visited September 30, 2020).

74.     In 2016, PRINCESS agreed to plead guilty to federal felony charges stemming from its illegal dumping of oil-contaminated bilge waste into the seas and intentional acts to cover it up. In its plea agreement, PRINCESS agreed to pay a $40 million penalty—the largest criminal penalty ever involving deliberate vessel pollution. Though CARNIVAL was not a defendant in the action, CARNIVAL signed the plea agreement and bound itself to its terms.

75.     The plea agreement noted that CARNIVAL "currently monitors and supervises environmental, safety, security, and regulatory requirements for Princess and other Carnival brands." Prior to the government investigation that led to the plea agreement, CARNIVAL had "undertaken steps to strengthen and enhance its oversight and compliance structure." For example, "the company initiated structural changes within its management organization, primary among which was the creation of a position titled 'Chief Maritime Officer,' placing the responsibility for overall environmental, safety, and security compliance in one individual …."

76.     The plea agreement required CARNIVAL to fund and implement an Environmental Compliance Plan ("ECP") across all of its brands, not just PRINCESS. The ECP required CARNIVAL to designate a Corporate Compliance Manager ("CCM") who was to "have overall responsibility for the implementation of[the] ECP" and "authorized to access all records, documents, facilities, and vessels, including all spaces within vessels necessary to perform their function, throughout CARNIVAL for the purpose of implementing [the] ECP."

77.     In 2019, the U.S. sought to revoke PRINCESS's probation for violating the terms of the ECP. The court in that case required members of the Executive Committee of the CARNIVAL Board of Directors (including the CEO and Chairman) be present at the revocation hearing.

78.     PRINCESS and CARNIVAL admitted to violating probation by failing to fully implement the ECP. In the settlement agreement for those violations, CARNIVAL agreed to issue a statement to all employees across all of its brands

stating that CARNIVAL's CEO "personally accepts management responsibility for the probation violations …." As part of the settlement, CARNIVAL agreed to submit "an action plan for restructuring its corporate compliance functions, which includes creating a new Ethics and Compliance Department at All Brands Group that is part of a broader Ethics and Compliance Program that extends throughout the brands/operating lines; …."  The settlement agreement was signed "on behalf of Defendant" by three members of the "Executive Committees of the Boards of Directors of Carnival Corporation and Carnival plc," but no representatives of PRINCESS.

79.    Also in 2019, CARNIVAL announced that it was creating a new Chief Ethics and Compliance Officer "to further develop our ethics and compliance program across the entire corporation." CARNIVAL explained that "[i]t is important to note that the Ethics & Compliance is not just a single department within  All Brands Group – but rather a corporate-wide program – with key Ethics & Compliance Officers . . . who help shape and implement the program initiatives in each of the operating companies."

80.    In March 2020, CARNIVAL announced that it was implementing a temporary pause of cruise operations across all of its brands, including PRINCESS, as a result of the COVID-19 pandemic. To address the costs of this temporary pause to its operations, the CEO of CARNIVAL wrote a message to all of the employees of CARNIVAL and its subsidiary brands, stating: "I've directed our brand leaders to reduce or eliminate non-critical cash expenditures, but of course never cutting anything that would impact compliant, environmentally sound and safe operations."

81.    In September 2020, CARNIVAL announced the sale of two of its cruise ships, the Sun Princes and the Sea Princess. PRINCESS announced that it was selling the ships because the sale "is in line with parent company Carnival Corporation's plan to accelerate the removal of less efficient ships from its fleet."[4]

---

[4] Princess Press Release, Sun Princess and Sea Princess to Leave Princess Cruises

82.     As demonstrated above, CARNIVAL has ownership and control over PRINCESS, and CARNIVAL exerts control and domination over PRINCESS's business and day-to-day operations. Plaintiff believes that further discovery will reveal the full extent of this control.

83.     Given CARNIVAL's control of operations and co-mingling of assets with PRINCESS—both of which can be more fully established through discovery—the corporate form should be disregarded here. Failure to do so would thwart the interests of justice by allowing CARNIVAL to, on one hand, claim the M/V GRAND PRINCESS as a part of its holdings, but then, on the other hand, disclaim responsibility for that vessel and the passengers traveling on it.

## **JURISDICTION**

84.     This Court has Admiralty subject matter jurisdiction pursuant to 28 U.S.C. § 1333 as this case involves a maritime tort. The type of incident and injuries suffered by Plaintiffs and the class had the potential to impact maritime commerce as Plaintiffs and the class suffered harm and Plaintiffs and the class were and continue to be at serious risk of imminent harm as a result of exposure to COVID-19 aboard the cruise ship upon which they were paying passengers.

85.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, codified at 28 USC §1332(d)(2)(A) and (C), because the claims of the proposed Class Members exceed $5,000,000, and because at least one member of the Proposed Class of plaintiffs is a citizen of a state different from at least one Defendant. Further, this court has jurisdiction over the claims of certain individual Plaintiffs under 28 U.S.C. § 1332 because the amount in controversy exceeds seventy-five thousand dollars ($75,000), as to each of the individual Plaintiffs and Plaintiffs are citizens of a different state than the Defendants.

---

Fleet, (Sept. 21, 2020), https://www.princess.com/news/notices_and_advisories/notices/sun-and-sea-princess-to-leave-princess-cruises-fleet.html (last visited Oct. 1, 2020).

86.     This Court has personal jurisdiction over Defendants, who each conduct substantial business in this district.

87.     Defendant PRINCESS has its headquarters in Santa Clarita, California.

88.     Upon information and belief, CARNIVAL, including by and through its subsidiary, PRINCESS, markets cruise vacations to California residents and employs thousands of California residents to work at its California headquarters. The Court has personal jurisdiction over CARNIVAL because CARNIVAL is authorized to do business in California, conducts substantial business in California, and some of the actions giving rise to this Complaint took place in California.

89.     The claims asserted herein arise from Defendants' contacts with California.

90.     Additionally, the Passage Contract purports to name the Central District as a proper venue to actions against the Defendants. Although Plaintiffs do not concede the enforceability of the Passage Contract, by naming this District as a proper venue, Defendants have consented to personal jurisdiction in this District.

91.     Each of the facts pleaded herein independently, but also all of these facts together, are sufficient to render the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

**VENUE**

92.     Venue in the Central District of California is proper under 28 U.S.C.§ 1391 because Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

93.     Additionally, without conceding the enforceability of the Passage Contract, Plaintiffs acknowledge the inclusion in the Passage Contract of a venue selection provision designating the United States District Court for the Central District of California in Los Angeles as a proper venue for this action.

**FACTUAL ALLEGATIONS**

**I.       COVID-19, Its Symptoms, and Long-Term Effects**

94.      In December 2019, a new strain of Coronavirus known as COVID-19 or SARS-CoV-2 was first reported as having been diagnosed in humans in China. The virus quickly spread through China and Asia and has caused a global pandemic.

95.      On January 20, 2020, the United States Centers for Disease Control and Prevention ("CDC") announced the first confirmed case in the U.S. Ten days later, on January 30, 2020, the CDC announced that it had identified, in Illinois, the first known instance of person-to-person spread (i.e. not related to travel outside of the United States).

96.      Also on January 30, 2020, the World Health Organization ("WHO") declared COVID-19 a "Public Health Emergency of International Concern." According to WHO, a Public Health Emergency of International Concern is "an extraordinary event which is determined to constitute a public health risk to other States through the international spread of disease and to potentially require a coordinated international response."

97.      On January 31, 2020, the U.S. Secretary for Health and Human Services declared a public health emergency for "the entire United States to aid the nation's healthcare community in responding" to COVID-19.[5]

98.      When Plaintiffs filed their First Amended Complaint there were approximately 1.7 million cases in the United States. Now, there are over 7 million confirmed cases. In the meantime, over 100,000 more people in the United States have died as a result of COVID-19 since the filing of the First Amended Complaint—bringing the total death toll to over 207,000 in the United States alone.

---

[5] Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergencyus-2019-novel-coronavirus.html (last visited Sept. 30, 2020).

The death toll worldwide is reported to be more than one million people out of more than 34 million confirmed cases.

99. The full scope of the impact of this pandemic remains unknown, as reports have indicated that the numbers of cases and deaths may be significantly undercounted.[6] One reason for this undercounting is due to the unavailability and inaccuracy of COVID-19 diagnostic tests in the United States, particularly during the early days of the pandemic.[7] Indeed, the initial test designed by the CDC contained critical flaws, and the process of developing a more accurate test delayed widespread availability of COVID-19 tests by weeks.[8]

100. Once testing became more widely available—though still not accessible to all those in need—it was, and has remained, inaccurate. In particular, experts warn of false negatives.[9] For instance, one San Francisco resident who traveled on Defendants' ship the DIAMOND PRINCESS reported taking over a

---

[6] Berkeley Lovelace Jr., *Official U.S. coronavirus death toll is 'a substantial undercount' of actual tally, Yale study finds*, CNBC, July 1, 2020, https://www.cnbc.com/2020/07/01/official-us-coronavirus-death-toll-is-a-substantial-undercount-of-actual-tally-new-yale-study-finds.html (last visited August 12, 2020); Apoorva Mandavilli, *Actual Coronavirus Infections Vastly Undercounted, C.D.C. Data Shows*, New York Times, June 27, 2020 (updated August 6, 2020), https://www.nytimes.com/2020/06/27/health/coronavirus-antibodies-asymptomatic.html (last visited August 12, 2020).

[7] *See* Olga Khazan, *The 4 Key Reasons the U.S. Is So Behind on Coronavirus Testing*, The Atlantic, March 13, 2020, https://www.theatlantic.com/health/archive/2020/03/why-coronavirus-testing-us-so-delayed/607954/ (last visited August 12, 2020).

[8] Caroline Chen, Marshall Allen, Lexi Churchill, and Isaac Arnsdorf, *Key Missteps at the CDC Have Set Back Its Ability to Detect the Potential Spread of Coronavirus*, ProPublica, February 28, 2020, https://www.propublica.org/article/cdc-coronavirus-covid-19-test.

[9] Lisa M. Krieger, Coronavirus false tests results: With a push to screen come questions of accuracy, The Mercury News, March 19, 2020, https://www.mercurynews.com/2020/03/19/coronavirus-false-test-results-with-the-push-to-screen-come-questions-of-accuracy/ (last visited August 12, 2020).

dozen COVID-19 tests during a month-long period. The tests returned alternating results of positive and negative.[10]

101.   The concern that negative test results could not be trusted led experts to advise those exposed to COVID-19 to quarantine for 14 days, *even if they tested negative for the virus*. Indeed, as described in more detail below, Defendants and the federal government required Plaintiffs in this case to participate in a two-week quarantine on military bases, and advised that they should do so regardless of a negative test.[11]

102.   Despite the likely drastic undercounting of case and death statistics, the numbers make abundantly clear that COVID-19 spreads swiftly, and poses grave risks to individuals exposed to it.

103.   The means by which the virus spreads are varied, and not yet fully known. Studies tend to show that the virus can be transmitted through person-to-person contact[12], but also through air flow, and on surfaces.[13] In particular, recent studies have indicated that spaces without poor or limited ventilation can cause greater accumulation of the airborne virus because of the presence of aerosolized droplets that can cause transmission.[14]

---

[10] *Id.*

[11] *Id.*

[12] Centers for Disease Control, How COVID-19 Spreads, Updated June 16, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited August 12, 2020).

[13] *Id.*; *see also* Apoorva Mandavilli, *A Smoking Gun': Infection Coronavirus Retrieved From Hospital Air*, August 11, 2020, https://www.nytimes.com/2020/08/11/health/coronavirus-aerosols-indoors.html (last visited August 12, 2020); Joshua L. Santarpia, et al., *Aerosol and surface contamination of SARS-CoV-2 observed in quarantine and isolation care,* Nature Research Scientific Reports (2020) 10:127732, https://www.nature.com/articles/s41598-020-69286-3

[14] Apoorva Mandavilli, *A Smoking Gun': Infection Coronavirus Retrieved From Hospital Air*, August 11, 2020, https://www.nytimes.com/2020/08/11/health/coronavirus-aerosols-indoors.html (last visited August 12, 2020)

104.   Likewise, the length of time that the virus can survive on surfaces remains unclear. But at least one study indicates that items with repeated and/or prolonged contact—such as a phone or television remote control—can carry the virus. The same study also showed the virus present on surfaces, such as floors and window sills, that were untouched by any patient, but which were in the stream of air flow in the patient's room.[15] Another study suggests that transmission is possible through shared elevator buttons.[16]

105.   The virus has an incubation period believed to be approximately 14 days,[17] but many of the ailments associated with COVID-19 persist for weeks and, in some instances, months.[18]

106.   The full extent and longevity of the virus's effects on the human body also remain unclear and—because of the virus's novelty—largely unstudied. The research that has been conducted suggests that exposure to and contraction of COVID-19 leads to a wide range of medical outcomes, from a mild cough and/or sore throat to sustained cardiac, kidney, liver, neurological, respiratory, and

---

[15] Joshua L. Santarpia, et al., *Aerosol and surface contamination of SARS-CoV-2 observed in quarantine and isolation care,* Nature Research Scientific Reports (2020) 10:127732, https://www.nature.com/articles/s41598-020-69286-3

[16] Aylin Woodward, *As asymptomatic coronavirus carrier infected an apartment neighbor without sharing the same space. A study blames the building's elevator buttons.*, Business Insider, July 5, 2020, https://www.businessinsider.com/coronavirus-jumped-between-people-via-elevator-surfaces-study-2020-7 (last visited August 12, 2020).

[17] Centers for Disease Control, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), Updated June 30, 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited August 12, 2020).

[18] Mark W. Tenforde, et al., *Symptom Duration and Risk Factors for Delayed Return to Usual Health Among Outpatients with COVID-19 in a Multistate Health Care Systems Network –United States, March-June 2020*, Morbidity and Mortality Weekly Report, July 31, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6930e1.htm (last visited August 12, 2020).

circulatory damage.[19] And, as shown by the statistics reported above, many patients die as a result of contracting the virus.

107.   COVID-19 is sometimes associated with symptoms such as:  fever, cough, shortness of breath, body and muscle aches, and loss of taste and smell. The virus manifests differently, however, in different patients, striking some with brutal swiftness and others with more mild symptoms. Some people who contract the virus have a fever; others do not. Some suffer from extreme fatigue; others do not. Some report having a sore throat; others do not.[20] Some COVID patients never display any of these "typical" symptoms and instead experience COVID-19 as more of a stomach virus, experiencing diarrhea and/or vomiting. Others never experience gastro-intestinal distress. Still, some people test positive for the virus while appearing to be entirely asymptomatic, with no symptoms whatsoever,[21] or only later develop effects from the virus.

108.   The multiple presentations of the disease made it difficult for a patient to immediately attribute their symptoms to COVID-19, especially in the early days of the pandemic, before the general public and treating physicians became more informed as to how the myriad manifestations of the disease.

109.   In addition to—and sometimes separate from—the symptoms described above, the virus can also wreak havoc on patients' organs. COVID-19 can cause heart and liver failure, kidney damage, neurological deficits, and blood clots that can lead to severe and/or multiple strokes and limb amputation.[22]

---

[19] Tara Parker-Pope, *The Many Symptoms of Covid-19*, The New York Times, August 5, 2020, https://www.nytimes.com/2020/08/05/well/live/coronavirus-covid-symptoms.html (last visited August 12, 2020).

[20] Centers for Disease Control, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), Updated June 30, 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited August 12, 2020).

[21] *Id.*

[22] Lenny Bernstein, Carolyn Y. Johnson, Sarah Kaplan and Laurie McGinley. *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts,*

THIRD AMENDED COMPLAINT
No. 2:20-cv-04203-RGK

110.    Research thus far has shown that patients who are believed to have "recovered" from COVID-19 continue to suffer life-altering and potentially life-threatening health problems.[23] For instance, one study found that at approximately 71 days after a positive COVID-19 test, irrespective of the severity of the patient's symptoms, the time of the original diagnosis, and any pre-existing conditions, 60% of patients evaluated showed signs of "ongoing myocardial inflammation." The same study discovered that 78% of patients demonstrated "cardiac involvement"—that is, these patients had abnormal cardiac readings associated with bad outcomes for cardio-myopathies.[24]

111.    Additionally, some patients who initially experience only mild symptoms (or no symptoms) later suffer catastrophic damage, such as stroke,[25] severe blood clots,[26] and/or cardiac inflammation like that described above.

112.    And some people contract and carry the virus without manifesting or experiencing any initial symptoms. Researchers have reported that even these

---

*and elsewhere.* The Washington Post. April 15, 2020. https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-3e1ae0a3571_story.html (last visited April 29, 2020).

[23] *See*, *e.g.*, Diana Lindner, et al., Association of Cardiac Infection With SARS-CoV-2 in Confirmed COVID-19 Autopsy Cases, JAMA Cardiology, July 27, 20202, https://jamanetwork.com/journals/jamacardiology/fullarticle/2768914 (finding "virus progeny" in the heart of autopsied COVID-19 patients).

[24] Valentina O. Puntmann, et al., Outcomes of Cardiovascular Magnetic Resonance Imaging in Patients Recently Recovered From Coronavirus Disease 2019 (COVID-19), JAMA Cardiology, July 27, 2020, https://jamanetwork.com/journals/jamacardiology/fullarticle/2768916 (last visited August 12, 2020).

[25] Ariana Eunjung Cha, Y*oung and middle-aged people, barely sick with covid-19 are dying of strokes*, The Washington Post, April 25, 2020, https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/ (last visited August 12, 2020).

[26] Tara Parker-Pope, *The Many Symptoms of Covid-19*, The New York Times, August 5, 2020, https://www.nytimes.com/2020/08/05/well/live/coronavirus-covid-symptoms.html (last visited August 12, 2020).

"asymptomatic" patients may in fact suffer long-term and/or later-manifesting harms, such as severe cardiac damage including myocarditis and arrhythmias.[27]

113.   Such occurrences were described by Dr. Jon Drezner, Director of the University of Washington Medicine Center for Sports Cardiology in Seattle, team physician for the Seattle Seahawks, Seattle Reign, and University of Washington Huskies, and advisor to the NCAA on cardiac issues, on an August 11, 2020 CNN broadcast. Drezner explained that "early on in the pandemic we learned that COVID-19 can affect the heart. And about one in four hospitalized have heart injury and raised a lot of questions and concerns about patients who weren't in the hospital."  He continued by posing the question: "Would patients who have mild symptoms or no symptoms have heart injury?" and further explained that, "More recently we've been learning that some college and professional athletes are inflicted with myocarditis (inflammation of the heart which can trigger arrhythmia or cardiac arrest) from COVID-19."

114.   Dr. Drezner confirmed that this potentially long-term damage can afflict someone who was asymptomatic or who experienced only a mild case of COVID-19 that did not require hospitalization. He said:  "We are learning that some athletes who really had no symptoms and go through subsequent testing are being diagnosed with myocarditis[,]" which is, in his words:  "inflammation of the heart muscle and it can lead to scar tissue in the heart.  And that scar tissue can be a focus for arrhythmia or even sudden cardiac arrest."[28]

115.   Likewise, a study that considers, among other things, the lingering impact of the virus on those with mild symptoms is currently underway at the University of California, San Francisco. Among the stuy's findings, is that children

---

[27] Carolyn Barner, *COVID-19 Can Wreck Your Heart, Even if You Haven't Had Any Symptoms*, Scientific American, August 31, 2020, https://www.scientificamerican.com/article/covid-19-can-wreck-your-heart-even-if-you-havent-had-any-symptoms (last visited September 30, 2020).

[28] Interview on CNN Anderson Cooper 360 August 11, 2020, transcript available at: http://transcripts.cnn.com/TRANSCRIPTS/2008/11/cnr.10.html

THIRD AMENDED COMPLAINT
No. 2:20-cv-04203-RGK

exposed to "adult relatives with flu-like symptoms" developed signs of Kawasaki disease, including lesions  on their feet and hands, *weeks or months* after that exposure.[29]

116.   Together, the multiple presentations of the virus, range of severity of symptoms—from asymptomatic to severe—the unavailability and inaccuracy of testing, along with the limited research about COVID-19 make it plausible that a person directly exposed to the virus, particularly for prolonged periods of time, like the passengers on the M/V GRAND PRINCESS, will suffer long-lasting, and potentially life-altering or fatal health effects.

117.   As a result and a proximate cause of Defendants PRINCESS and CARNIVAL exposing Plaintiffs to COVID-19 aboard the M/V GRAND PRINCESS, as described in more detail below, and because of the nature of the virus and its long-term health effects, Plaintiffs will require medical monitoring and diagnostic examinations into the future. This monitoring is required to diagnose, prevent, and/or treat current or future injury related to Plaintiffs' and Class members' exposure to, contraction of, illness and disease related to, asymptomatic contraction of, and potential contraction of COVID-19, in light of the evolving scientific understanding of the full risk and scope of health outcomes related to and/or resulting from the virus.

## II.   Carnival and Princess Knew or Should Have Known the Risks of Viral Contagion Aboard Their Cruise Ships.

118.   In early February 2020, experts in the European Union, led by epidemiologist Dr. Christou Hadjichristodoulou, released specific guidelines for the cruise industry that included an outline of the risk of COVID-19 outbreaks aboard

---

[29] Peter Fimrite, *Long after the illness is gone, damage from coronavirus may remain*, San Francisco Chronicle, May 31, 2020, https://www.sfchronicle.com/health/article/Long-after-the-illness-is-gone-the-damage-from-15305842.php?utm_campaign=CMS%20Sharing%20Tools%20(Premium)&utm_source=share-by-email&utm_medium=email (last visited August 13, 2020)

cruise ships and recommended response protocols.[30] Specifically, the guidelines directed that, in the event of a COVID-19 case, "close contacts" of the individuals believed to have COVID-19 should be quarantined in their cabin or on shore, and "casual contacts" should be disembarked from the ship.[31]

119.   On February 12, 2020, the CDC issued guidance for ships on managing COVID-19.[32] The guidance noted that commercial shipping, including cruise ships, "involves the movement of large numbers of people in closed and semi-closed settings. Like other close-contact environments, ships may facilitate transmission of respiratory viruses from person to person through exposure to respiratory droplets or contact with contaminated surfaces." The guidance recommended "[i]dentifying and isolating passengers and crew with possible symptoms of COVID-19 as soon as possible." It also recommended that "[p]assengers and crew members who have had high-risk exposures to a person suspected of having COVID-19 should be quarantined in their cabins."

120.   In or before early February 2020, Defendants became aware of an outbreak of COVID-19 aboard the cruise ship the DIAMOND PRINCESS, which is owned and/or operated by CARNIVAL and PRINCESS. The outbreak originated

_____

[30] Interim Advice for Preparedness and Response to Cases of Acute Respiratory Disease at Points of Entry in the European Union (EU) / EEA Member States (MS): Advice for ship operators for preparedness and response to the outbreak of 2019-nCoV acute respiratory disease, Feb. 3, 2020, https://www.gac.com/491364/siteassets/about-gac/coronavirus/eu-interim-advice_2019-ncov_maritime_4_2_2020_f.pdf (last visited April 6, 2020); *see also* Matt Apuzzo, Motoko Rich and David Yaffe-Bellany, *Failures on Diamond PrincessShadow Another Cruise Ship Outbreak*, The New York Times, March 8, 2020, https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html (last visited April 6, 2020).

[31] Healthy GateWays, Algorithm for decision making in response to an event of a suspect case of COVID-19, https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html (last visited April 6, 2020).

[32] Interim Guidance for Ships on Managing 2019 Novel Coronavirus, Feb. 12, 2020 (updated Feb. 15), https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html (last visited Sept. 30, 2019).

on the DIAMOND PRINCESS while the vessel was docked in Yokohama, Japan. Ten cases were originally diagnosed, and that number rapidly escalated to over 700 cases—over one-fifth of the passengers and crew members onboard the ship at the time. Investigative reporting about the DIAMOND PRINCESS revealed that well after CARNIVAL and PRINCESS became aware of the first case aboard the ship, Defendants worked to "keep the fun going" by "encouraging [guests] to mingle."[33]

121.   To date, at least 14 of the DIAMOND PRINCESS's passengers have died as a result of COVID-19.[34] At least two of these fatalities occurred before February 19, 2020.[35]

122.   In a February 18, 2020, update issued in response to the crisis aboard the DIAMOND PRINCESS, the CDC stated that "the rate of new reports of positives [now] on board, especially among those without symptoms, highlights the high burden of infection on the ship and potential for ongoing risk."[36]

123.   Upon information and belief, in February 2020, CARNIVAL and PRINCESS also operated a voyage on the RUBY PRINCESS, from New Zealand to Australia. News reports suggest that in mid-to-late February, Defendants became aware of COVID-19 cases onboard the RUBY PRINCESS. Despite this information, CARNIVAL operated a second voyage on the RUBY PRINCESS, immediately following the New Zealand-to-Australia voyage. Since the vessel

---

[33] Austin Carr and Chris Palmieri, *Socially Distance This: Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going*, Bloomberg, April 16, 2020,  https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/ (last visited April 20, 2020).

[34] Lauren Smiley, *27 Days in Tokyo Bay: What Happened on the Diamond Princess*, Wired, May 13, 2020, https://www.wired.com/story/diamond-princess-coronavirus-covid-19-tokyo-bay/.

[35] *See* The New York Times, *Japan Reports 2 Deaths Among Cruise Ship Passengers*, Feb. 19, 2020, https://www.nytimes.com/2020/02/19/world/asia/china-coronavirus.html (last visited April 6, 2020).

[36] *See* Centers for Disease Control and Prevention, Update on the Diamond Princess Cruise Ship in Japan, Feb. 18, 2020, https://www.cdc.gov/media/releases/2020/s0218-update-diamond-princess.html (last visited April 6, 2020).

docked in Australia on March 19, 2020, over 600 passengers who were on the RUBY PRINCESS have tested positive for the virus and 10 have died. Australian authorities have announced a criminal investigation into the matter.

124.   To date, cruises run by CARNIVAL and PRINCESS have been identified as responsible for more than 1,600 positive COVID-19 infections, and over 50 deaths.

## III.   Carnival Undertook an Independent Duty of Care Toward Plaintiffs

125.   Through its public statements and conduct, Defendant CARNIVAL specifically undertook a duty to maintain a safe environment aboard the cruise ships in its fleet, including the M/V GRAND PRINCESS.

126.   For instance, CARNIVAL represented to its customers and the general public that it had a commitment to "[p]rotecting the health, safety and security of our passengers, guests, employees and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss. … [and] assigning health, environment, safety, security (HESS) and sustainability matters the same priority as other critical business matters."[37] They further assert that they "[s]upport a proactive framework of risk mitigation in the areas of HESS aimed at preventing, monitoring and responding to threats."[38]

127.   CARNIVAL promulgated HESS policies for all of its cruise line brands, including PRINCESS. CARNIVAL's HESS Corporate Policy, which is available to the public on CARNIVAL's website, states that CARNIVAL will

---

[37] Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, https://www.carnivalcorp.com/leading-responsibly/health-environment-safety-security-sustainability-policy-governance/ (last visited April 7, 2020).

[38] Carnival Corporation & PLC Health, Environmental, Safety, Security, and Sustainability Corporate Policy, https://www.carnivalcorp.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited September 30, , 2020).

"ensure compliance with this [HESS] policy within each of Carnival's Corporate and Operating Line organizations."[39]

128.   CARNIVAL knew, as explained in an article co-authored by its own Chief Medical Officer, Dr. Grant Tarling, that cruise ships "represent a potential source for introduction of novel or antigenically drifted influenza virus strains to the United States" and that cruise ship characteristics, such as "close quarters and prolonged contact among travelers on ships and during land-based tours before embarkation, increase the risk of communicable disease transmission."[40]

129.   The 2016 federal plea agreement noted that CARNIVAL "currently monitors and supervises environmental, safety, security, and regulatory requirements for Princess and other Carnival brands." Prior to the government investigation that led to the plea agreement, CARNIVAL had "undertaken steps to strengthen and enhance its oversight and compliance structure." For example, "the company initiated structural changes within its management organization, primary among which was the creation of a position titled 'Chief Maritime Officer,' placing the responsibility for overall environmental, safety, and security compliance in one individual …."

130.   Given these assurances and representations, CARNIVAL undertook an independent duty to abide by its commitments and to protect passengers on all of its cruise lines, including PRINCESS, from reasonably-avoidable hazards, such as exposing passengers for a prolonged period of time on a ship known to be infested with a potentially-lethal virus.

---

[39] *Id.*

[40] Kimberly B. Rogers, MPH, Shahrokh Roohi, MPH, Timothy M. Uyeki, MD, *et al.*, *Laboratory-based respiratory virus surveillance pilot project on select cruise ships in Alaska, 2013-2015*, Journal of Travel Medicine 2017, 1-6, at 2 (2017).

#### IV.   **PRINCESS was an Apparent Agent of CARNIVAL**

131.   CARNIVAL represented to the public that PRINCESS was its agent, causing passengers to justifiably rely upon the care and skill of PRINCESS to maintain a safe environment aboard the M/V GRAND PRINCESS.

132.   On its website, CARNIVAL prominently displays the PRINCESS name and logo, describing PRINCESS as part of its "family" of cruise line brands. CARNIVAL's website states that potential customers "need look no further than the Carnival family when selecting a cruise vacation."

133.   CARNIVAL promulgated HESS policies for all of its cruise line brands, including PRINCESS. CARNIVAL's HESS Corporate Policy, which is available to the public on CARNIVAL's website, states that CARNIVAL will "ensure compliance with this [HESS] policy *within each of Carnival's Corporate and Operating Line organizations*."[41]

134.   The web page on which CARNIVAL publicizes its HESS policy specifically identifies PRINCESS as a part of CARNIVAL CORPORATION and CARNIVAL PLC, representing that the policy applies to the subsidiary as well as the parent.

#### V.   **What Makes Cruise Ships Different From Other Businesses**

135.   In some material respects, in the context of COVID-19 claims, common carriers like cruise ships undertaking custodial, long-haul, open-water voyages present heightened risks to passengers that differ from other land-based businesses. With these heightened risks, as factual and legal matters, come additional attendant obligations on the owners and operators of cruise ships.

136.   As Defendants knew, cruise ships are particularly susceptible to rapid viral contagion because—unlike other businesses, such as restaurants, retail shops,

---

[41] Carnival Corporation & PLC Health, Environmental, Safety, Security, and Sustainability Corporate Policy, https://www.carnivalcorp.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited September 30, 2020) (emphasis added).

and other consumer-facing businesses—after embarkation, passengers are effectively trapped onboard. PRINCESS and CARNIVAL had a custodial role over their passengers, who had no option for safe and fast exit while the vessel remained at sea.

137.   Cruise ships like M/V GRAND PRINCESS have a high population density, and the population is characterized by "relatively homogenous mixing"—meaning, there are a lot of people onboard, and they are all interacting with one another.[42]

138.   CARNIVAL and PRINCESS were and are well-aware of the fact that their crew members interact closely with passengers and often travel on multiple trips back-to-back, putting crew members into close contact with thousands of passengers in short periods of time. What's more, these crew members and the ship's passengers share a number of confined, public spaces—such as elevators and public restrooms—and interact with a myriad of shared, and frequently-touched surfaces, including but certainly not limited to the utensils used to serve food on buffet lines, elevator buttons, hand railings, chairs, cards and other game pieces, and door handles. The frequency with which individuals touch these surfaces along with the sheer number of people who come into contact with them in a limited period of time make cruise ships uniquely dangerous for the spread of viruses, including COVID-19.

139.   CARNIVAL and PRINCESS also understood, based on their years of specific experience operating cruise ships, the limited air flow and low ventilation in the interior of cruise ships, and they knew that these conditions make airborne

---

[42] J. Rocklov and H. Sjodin, COVID-19 outbreak on the Diamond Princess cruise ship: estimating the epidemic potential and effectiveness of public health countermeasures, Journal of Travel Medicine, Published February 28, 2020, https://academic.oup.com/jtm/article/27/3/taaa030/5766334 (last visited August 12, 2020).

viruses all the more hazardous on board a ship, particularly where passengers are exposed for a lengthy period of time during a long-haul, open-water voyage.

140.   Years before the COVID-19 outbreaks aboard the DIAMOND PRINCESS, RUBY PRINCESS, and M/V GRAND PRINCESS, CARNIVAL and PRINCESS's own Group Senior Vice President and Chief Medical Officer Grant Tarling, M.D., M.P.H. co-authored an article that acknowledged that cruise ships "represent a potential source for introduction of novel or antigenically drifted influenza virus strains to the United States" and that cruise ship characteristics, such as "close quarters and prolonged contact among travelers on ships and during land-based tours before embarkation, increase the risk of communicable disease transmission."[43]

141.   A study published on February 28, 2020, echoed Dr. Tarling's findings, and highlights the unique conditions of cruise ships that "amplified" the spread of COVID-19 among those onboard the Diamond Princess.[44] The study also revealed that extended periods of time on the ship without quarantine increased the spread of the virus.

142.   The combination of the aforementioned factors, among other factors, make cruise ships distinctly susceptible to rapidly and pervasively spreading pathogens in ways that differ from most other businesses, which was well-known to Defendants.

---

[43] Kimberly B. Rogers, MPH, Shahrokh Roohi, MPH, Timothy M. Uyeki, MD, *et al.*, *Laboratory-based respiratory virus surveillance pilot project on select cruise ships in Alaska, 2013-2015*, Journal of Travel Medicine 2017, 1-6, at 2 (2017).

[44] J. Rocklov and H. Sjodin, *COVID-19 outbreak on the Diamond Princess cruise ship: estimating the epidemic potential and effectiveness of public health countermeasures*, Journal of Travel Medicine, Published February 28, 2020, https://academic.oup.com/jtm/article/27/3/taaa030/5766334 (last visited August 12, 2020).

## VI.    The February 11, 2020 M/V GRAND PRINCESS Cruise to Mexico

143.    Despite their awareness of the unique risks created by the cruise ship environment, and their experiences with COVID-19 outbreaks on other vessels, on February 11, 2020, Defendants operated a roundtrip voyage from San Francisco to Mexico aboard the M/V GRAND PRINCESS. On or around February 19, 2020, Defendants became aware of at least one passenger suffering from COVID-19 symptoms onboard the M/V GRAND PRINCESS.

144.    According to PRINCESS's and CARNIVAL's Chief Medical Officer, Grant Tarling, MD, MPH, Defendants believed the infected passenger was already carrying the virus when he boarded the M/V GRAND PRINCESS on February 11, 2020.[45] Despite their knowledge regarding COVID-19, Defendants had no effective passenger medical screening methods in place at the time of boarding.

145.    Dr. Tarling reported that the infected passenger sought medical treatment from the medical center onboard the M/V GRAND PRINCESS on February 20, 2020. The passenger reported suffering from "acute respiratory distress" for about a week before seeking treatment. Upon information and belief, this information would have triggered mandatory reporting under 42 C.F.R. 71.1, *et seq.* and constitutes a "hazardous condition" per 33 C.F.R. § 160.216.[46]

146.    Upon information and belief, at least three other passengers on the M/V GRAND PRINCESS's Mexico trip suffered from COVID-19 symptoms while

---

[45] Thomas Fuller, John Eligon, and Jenny Gross, *Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland*, The New York Times, March 9, 2020, https://www.nytimes.com/2020/03/09/us/coronavirus-cruise-ship-oakland-grand-princess.html (last visited April 7, 2020).

[46] Section 160.216 requires that "[w]henever there is a hazardous condition … on board a vessel or caused by a vessel or its operation, the owner, agent, master, operator, or person in charge must immediately notify the nearest Coast Guard Sector Office . . . ." A"[h]azardous condition means any condition that may adversely affect the safety of any vessel … or the environmental quality of any port, harbor, or navigable waterway of the United States. It may, but need not, involve … injury *or illness of a person aboard* … ." 33 CFR § 160.202 (emphasis added).

on the vessel, likely exposing dozens of other passengers to the virus. At least 100 passengers who traveled on board the M/V GRAND PRINCESS have tested positive for COVID-19, and two passengers who traveled on the M/V GRAND PRINCESS's Mexico trip died after disembarking. One of these fatalities was the first-reported death caused by COVID-19 in California.[47]

147.   On February 21, 2020, the M/V GRAND PRINCESS arrived at port in San Francisco and some of the passengers from the Mexico trip disembarked.

148.   Approximately sixty-two passengers, at least two of whom were ill, and over 1,000 crew members remained onboard the M/V GRAND PRINCESS to continue traveling on the ship's next voyage, to Hawaii. Defendants did not implement any effective COVID-19 medical screening or examination procedures for crew or passengers who remained onboard and were continuing on for the Hawaii voyage.

149.   Defendants did not initiate effective measures to sanitize or disinfect the vessel in-between voyages, and did not implement any procedures for screening or testing existing or new passengers boarding the ship for the Hawaii-bound voyage.

150.   Defendants did not notify passengers who were scheduled to board the vessel on February 21, 2020, that passengers from the prior Mexico trip had reported COVID-19 symptoms, or of the fact that passengers remaining on board the M/V GRAND PRINCESS had been exposed to and might be infected with

---

[47] It has since been discovered that other Californians suffered from and died as a result of COVID-19 prior to the February 11, 2020 cruise aboard the M/V GRAND PRINCESS. Nevertheless the death of a Placer County resident who traveled on the M/V GRAND PRINCESS's February 11, 2020 cruise to Mexico spurred the state's initial stay-at-home orders. *See* Placer County Announces Death of Patient with COVID-19, March 4, 2020, https://www.placer.ca.gov/6438/Death-of-patient-with-COVID-19 (last visited May 19, 2020); Bill Chapel, *Coronavirus Deaths in Washington and California, Where Gov. Declares Emergency*, NPR, March 4, 2020, https://www.npr.org/sections/health-shots/2020/03/04/812121540/coronavirus-los-angeles-declares-emergency-and-u-s-reports-80-cases-in-13-states (last visited May 19, 2020).

and/or carrying the virus. With the known likely presence of the virus in passengers and crew members who remained on the ship, the ship never should have sailed on to Hawaii.

**VII.    The February 21, 2020 M/V GRAND PRINCESS Voyage to Hawaii**

151.    On February 21, 2020, Plaintiffs embarked onto the M/V GRAND PRINCESS, and the ship departed the same day. The vessel sailed to Hawaii and made multiple stops on the Hawaiian Islands.

152.    Although PRINCESS and CARNIVAL had assured passengers that the trip would be safe and that PRINCESS and CARNIVAL would take measures, such as requiring temperature checks for those boarding the ship, in order prevent the presence of COVID-19 on the M/V GRAND PRINCESS, Defendants instituted no such effective measures. Plaintiffs and other passengers were not asked to check their temperatures, and were not subject to any medical screening upon boarding the ship other than a questionnaire that asked them if they had felt ill or recently traveled to China.

153.    On information and belief, on or about February 25, 2020, while Plaintiffs were in the midst of the Hawaii trip aboard the M/V GRAND PRINCESS, CARNIVAL and PRINCESS sent emails to passengers who disembarked from the San Francisco-to-Mexico trip on February 21, 2020. The email alerted the earlier passengers about their potential exposure to COVID-19 during their time on the cruise. No such notice was effectively provided to passengers who were onboard the ship on February 25, 2020.

154.    On February 29, 2020, the vessel left Hawaii.

155.    Upon information and belief, increased sanitary precautions did not begin onboard the M/V GRAND PRINCESS until on or about March 3, 2020.

156.    CARNIVAL and PRINCESS did not inform the passengers on board the M/V GRAND PRINCESS of COVID-19 cases in passengers who traveled on the ship's Mexico trip until March 4, 2020, when, early in the morning, the

1    Plaintiffs and other members of the proposed Class received a health advisory. The

2    advisory explained that the ship would no longer be traveling to Ensenada, Mexico,

3    as originally scheduled. It would instead return directly to San Francisco. Further,

4    the advisory alerted passengers to the investigation of a "small cluster of COVID-

5    19 cases in Northern California connected to" the M/V GRAND PRINCESS's

6    Mexico trip, and informed passengers of their potential exposure to the virus.

7        157.    Additionally, the advisory asserted that COVID-19 causes "mild

8    illness in about 80% of cases," and that only "[a]bout 20% of people develop more

9    severe symptoms."

10       158.    The March 4, 2020 health advisory suggested that passengers traveling

11   on the Hawaii trip had already reported suffering from COVID-19 symptoms, and

12   instructed other passengers who were experiencing or had at any time during the

13   trip experienced symptoms "of acute respiratory illness with fever chills or cough"

14   to immediately contact the ship's Medical Center. Finally, the advisory

15   recommended that passengers wash their hands, use hand sanitizer, avoid contact

16   with those suffering from respiratory illness, cover their noses and mouths when

17   coughing and sneezing, and avoid touching their eyes and face. It did not make any

18   recommendations for quarantine or social distancing measures. Nor did it call for

19   passengers to wear masks.

20       159.    The March 4th health advisory was signed by Grant Tarling, MD,

21   MPH , the Group Senior Vice President and Chief Medical Officer for PRINCESS

22   and other CARNIVAL subsidiaries.

23       160.    Upon information and belief, individuals who had continued on to

24   Hawaii from the prior leg of the cruise to and from Mexico began cabin-based

25   quarantine for the first time on or around March 4, 2020. At that time, Defendants

26   cancelled only large public gatherings, and continued hosting other events

27   identified in the daily newsletter, the "Princess Patter," including Formal Night and

28   its associated dinner.

THIRD AMENDED COMPLAINT
No. 2:20-cv-04203-RGK

161.   On information and belief, other CARNIVAL-owned cruise companies operated in a similar manner upon discovering that one or more of their passengers or crew members had exhibited COVID-19 symptoms. On the M/V DIAMOND PRINCESS, guests were encouraged to "mingle." And, on the M/S ZAANDAM (operated by Carnival subsidiary Holland America), after crew members and passengers reported suffering from COVID-19 symptoms, the ship's operators not only continued hosting large-scale events, but also instituted *additional* group activities to keep passengers occupied.

162.   Taken together, all the foregoing suggest a fact that can be confirmed and further developed through discovery:  that CARNIVAL directed the manner in which its subsidiaries, including PRINCESS, responded to COVID-19 outbreaks.

163.   Spurred by the COVID-19 outbreak on the M/V GRAND PRINCESS and the death of a passenger who had been on the Mexico trip, Governor Gavin Newsom declared a state of emergency in California on March 4, 2020, to manage the COVID-19 outbreak. As a result, the State of California refused to allow the vessel into port in San Francisco, forcing the vessel to anchor off the city's coast. Governor Newsom stated at a press conference that there were 11 passengers and 10 crew members on the ship who were experiencing symptoms.

164.   On or about Thursday, March 5, 2020, two weeks after the ship sailed from San Francisco harbor, Defendants instituted more operational changes, including cabin/state room quarantine, meal service to the cabins/state rooms by placing trays in the hallway outside cabin doors, and cessation of daily turndown service and all communal activities.

165.   On or about March 7, 2020, Defendants announced through the ship's public address system that they had evacuated a critically-ill passenger by ship's tender and a U.S. Coast Guard cutter.

166.   On or about March 9, 2020, the ship was allowed to sail into and arrived in the San Francisco Bay escorted by the U.S. Coast Guard. The ship

1   docked in the Port of Oakland and was met by ambulances and medical personnel.

2   During the night, a CDC employee, in full hazmat gear, knocked on some cabin

3   doors asking passengers if they had any symptoms.

4       167.   On or about March 10, 2020, passengers, including Plaintiffs, were

5   finally allowed to disembark. Most passengers were shuttled to Travis Air Force

6   Base in Solano County, California for further quarantine. Others were transported

7   to Asilomar State Beach and Conference Grounds in Pacific Grove, or to other

8   military bases, including Mira Mar in San Diego and Dobbins Air Force Base, in

9   Georgia.

10       168.   A report from the CDC about the COVID-19 outbreak about the M/V

11   GRAND PRINCESS found that "crew members were likely infected on voyage A

12   and then transmitted [the virus] to passengers on voyage B" and that the ship "was

13   an example of perpetuation of transmission from crew members across multiple

14   consecutive voyages and the potential introduction of the virus to passengers and

15   crew on other ships."[48]

16       169.   At the time of this filing, Defendant CARNIVAL has cancelled future

17   cruises embarking from San Francisco through the end of 2020. However,

18   CARNIVAL's website indicates that it intends to begin operating certain cruise

19   ships as early as October 31, 2020, potentially posing grave threats to their

20   passengers, crew members, and the public health.[49]

21       170.   If Plaintiffs had known that they would be exposed to COVID-19, face

22   the serious and actual risks of contracting or spreading COVID-19, and actually

23   contract and suffer from COVID-19, while onboard the M/V GRAND PRINCESS,

---

[48] L. Moriarty, et al., Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020, 69 Morbidity and Mortality Weekly Report 1, 1 (Mar. 23, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf (last visited Sept. 30, 2020).

[49] *See* Carnival, Health and Safety Updates, https://www.carnival.com/health-and-sailing-updates (last visited August 13, 2020).

THIRD AMENDED COMPLAINT
No. 2:20-cv-04203-RGK

because, among other things, passengers from the M/V GRAND PRINCESS's San Francisco-to-Mexico trip had suffered from COVID-19 and / or that passengers exposed to COVID-19 on the Mexico trip remained onboard the M/V GRAND PRINCESS, Plaintiffs would not have sailed on the February 21, 2020, roundtrip voyage to Hawaii.

## VIII.  THE CDC'S DEFINITION OF A "PROBABLE CASE"

171.   In an April 5, 2020 position statement, the CDC and the Council of State and Territorial Epidemiologists ("CSTE") provided an "interim case definition" for COVID-19 for the purposes of counting and tracking "probable" and "confirmed" COVID-19 cases in the United States.[50]

172.   The interim definition provided three alternative clinical measures for evaluating a patient.

173.   First, a case meets the clinical criteria if there is no alternative more likely diagnosis and at least two of the following symptoms are present:  fever (measured or subjective), chills, rigors, myalgia, headache, sore throat, or new olfactory and taste disorder(s).

174.   Second, a case meets the clinical criteria if there is no alternative more likely diagnosis and at least one of the following symptoms are present:  cough, shortness of breath, or difficulty breathing.

175.   Third, a case meets the clinical criteria if there is no alternative more likely diagnosis and a patient suffers from severe respiratory illness with at least one of either clinical or radiographic evidence of pneumonia or acute respiratory distress syndrome.

---

[50] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19) 2020 Interim Case Definition, Approved April 5, 2020, https://wwwn.cdc.gov/nndss/conditions/coronavirus-disease-2019-covid-19/case-definition/2020/ (last visited August 14, 2020).

176.   The interim definition also provided that a case meets the laboratory criteria if there are positive results returned from a diagnostic test, an antigen test, or an antibody test.

177.   And, the CDC and CSTE identified a number of "epidemiological" criteria that should be considered when evaluating a potential COVID-19 case. Specifically, whether the patient was within 6 feet for 10 to 30 minutes or more with a person who has a confirmed or probable COVID-19 case; whether the patient was within 6 feet for 10 to 30 minutes or more with a person with a "clinically compatible illness" and some link exists to a confirmed COVID-19 case; whether the patient traveled to or resided in an area with sustained, ongoing community transmission of COVID-19; and/or whether the patient is a member of an at-risk cohort.

178.   Patients who meet both the clinical and epidemiological criteria are considered probable COVID-19 cases, as are those patients who presumptively meet the laboratory criteria and either the clinical or epidemiological criteria.

179.   The position statement also recognized that "field investigations will involve evaluations of persons with *no symptoms* and *these individuals will need to be counted as cases*."

180.   In addition to the above-listed clinical criteria, the CDC has published more up-to-date information regarding the range of symptoms created by COVID-19. This list, which the CDC concedes is not comprehensive, includes:

      a.     Fever or chills

      b.     Cough

      c.     Shortness of breath or difficulty breathing

      d.     Fatigue

      e.     Muscle or body aches

      f.     Headache

      g.     New loss of taste or smell

h.      Sore throat

i.       Congestion or runny nose

j.       Nausea or vomiting

k.      Diarrhea[51]

## IX.    **PLAINTIFFS' MEDICAL EXPERIENCES**

181.   Plaintiffs were all exposed, in close proximity for extended periods of time, to individuals who were or were probably carrying COVID-19, including crew members onboard the M/V GRAND PRINCESS and their fellow passengers. Plaintiffs likewise effectively "resided in" for over two weeks a community—the cruise ship—that experienced sustained and ongoing transmission, as is evidenced by the vast number of passengers onboard the vessel who became ill with COVID-19. Most Plaintiffs also suffered symptoms in line with the clinical criteria identified by the CDC and CSTE.

182.   Before boarding the M/V GRAND PRINCESS, Plaintiff ROBERT ARCHER was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. He had not travelled outside the United States in the two weeks prior to boarding.

183.   On or around February 24, 2020, while onboard the M/V GRAND PRINCESS, ROBERT ARCHER attended a "Chef's Dinner," where he was seated with four passengers who had been on the M/V GRAND PRINCESS's San Francisco-Mexico voyage and remained onboard. He also attended events and activities where he was in close proximity to numerous other passengers and crew members.

---

[51] Center for Disease Control and Prevention, Symptoms of Coronavirus, Updated May 13, 2020 https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html# (last visited August 14, 2020).

184.   On or around March 3, 2020, ROBERT ARCHER developed a persistent cough. On or around March 6, 2020, he began experiencing chills, fever, and diarrhea, all of which continued for days. He also developed numbness in his feet, ankles, and shins, which have still not abated. He later tested positive for COVID-19 antibodies. Based on his positive test results, the timing of the onset of his symptoms, and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that ROBERT ARCHER contracted COVID-19 during the subject voyage.

185.   Before boarding the M/V GRAND PRINCESS, Plaintiff MARLENE ARCHER was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside the United States in the two weeks prior to boarding.

186.   On or around February 24, 2020, while onboard the M/V GRAND PRINCESS, MARLENE ARCHER attended a "Chef's Dinner," where she was seated with four passengers who had been on the M/V GRAND PRINCESS's San Francisco-Mexico voyage and remained onboard. She also attended events and activities where she was in close proximity to numerous other passengers and crew members.

187.   On or around March 6, 2020, MARLENE ARCHER began to suffer from fatigue, a loss of taste and smell, and chills. She has still not recovered her senses of taste and smell. Based on her positive test results, the timing of the onset of her symptoms, and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that MARLENE ARCHER contracted COVID-19 during the subject voyage.

188.   Before boarding the M/V GRAND PRINCESS, Plaintiff JACQUELINE GRAHAM was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited

1 symptoms of COVID-19. She had not travelled outside the United States in the two

2 weeks prior to boarding.

3   189. On or around February 24, 2020, while onboard the M/V GRAND

4 PRINCESS, JACQUELINE GRAHAM attended the "Chef's Dinner," where she

5 was seated with passengers who had been on the M/V GRAND PRINCESS's San

6 Francisco-Mexico voyage and remained onboard. She also attended events and

7 activities where she was in close proximity to numerous other passengers and crew

8 members.

9   190. On or around March 5, 2020, JACQUELINE GRAHAM began

10 experiencing severe pain throughout her body. She also lost her senses of taste and

11 smell. Her symptoms continued for over two months. She later tested positive for

12 COVID-19 antibodies. Based on her positive test results, the timing of the onset of

13 her symptoms, and the CDC's definition of a "probable case" of COVID-19, it is

14 more likely than not that JACQUELINE GRAHAM contracted COVID-19 during

15 the subject voyage.

16   191. Before boarding the M/V GRAND PRINCESS, Plaintiff ROBERT

17 GRAHAM was not exhibiting any symptoms of COVID-19 nor had he been

18 exposed to anyone who had been diagnosed with or who exhibited symptoms of

19 COVID-19. He had not travelled outside the United States in the two weeks prior to

20 boarding.

21   192. On or around February 24, 2020, while onboard the M/V GRAND

22 PRINCESS, ROBERT GRAHAM attended the "Chef's Dinner," where he was

23 seated with passengers who had been on the M/V GRAND PRINCESS's San

24 Francisco-Mexico voyage and remained onboard. He also attended events and

25 activities where he was in close proximity to numerous other passengers and crew

26 members.

27   193. On or around March 7, 2020, ROBERT GRAHAM developed a

28 persistent cough, began experiencing severe fatigue, muscle and bone pain, and a

1   loss of his senses of taste and smell. His symptoms continued for over two months.

2   He later tested positive for COVID-19 antibodies. Based on his positive test results,

3   the timing of the onset of his symptoms, and the CDC's definition of a "probable

4   case" of COVID-19, it is more likely than not that ROBERT GRAHAM contracted

5   COVID-19 during the subject voyage.

6       194.   Before boarding the M/V GRAND PRINCESS, Plaintiff PAMELA

7   GIUSTI was not exhibiting any symptoms of COVID-19 nor had she been exposed

8   to anyone who had been diagnosed with or who exhibited symptoms of COVID-19.

9   She had not travelled outside the United States in the two weeks prior to boarding.

10      195.   On or around February 24, 2020, while onboard the M/V GRAND

11  PRINCESS, PAMELA GIUSTI attended the "Chef's Dinner," where she was

12  seated with passengers who had been on the M/V GRAND PRINCESS's San

13  Francisco-Mexico voyage and remained onboard. She also attended events and

14  activities where she was in close proximity to numerous other passengers and crew

15  members.

16      196.   On or around March 9, 2020, PAMELA GIUSTI began experiencing

17  fever, fatigue, and a loss of smell and taste. These symptoms are all associated with

18  COVID-19. On March 15, 2020, she tested positive for COVID-19, and was treated

19  in an intensive care unit for 10 days at Kaiser Permanente Medical Center. Based

20  on her positive test results, the timing of the onset of her symptoms, and the CDC's

21  definition of a "probable case" of COVID-19, it is more likely than not that

22  PAMELA GIUSTI contracted COVID-19 during the subject voyage.

23      197.   Before boarding the M/V GRAND PRINCESS, Plaintiff GINA

24  PALLOTTA was not exhibiting any symptoms of COVID-19 nor had she been

25  exposed to anyone who had been diagnosed with or who exhibited symptoms of

26  COVID-19. She had not travelled outside the United States in the two weeks prior

27  to boarding.

28

1    198.   While onboard the M/V GRAND PRINCESS, GINA PALLOTTA

2    attended events and activities where she was in close proximity to numerous other

3    passengers and crew members.

4    199.   On or around March 10, 2020, GINA PALLOTTA began to suffer

5    from fatigue, shortness of breath, and a runny nose. Based on the timing of the

6    onset of her symptoms and the CDC's definition of a "probable case" of COVID-

7    19, it is more likely than not that GINA PALLOTTA contracted COVID-19 during

8    the subject voyage.

9    200.   Before boarding the M/V GRAND PRINCESS, Plaintiff JEFFREY

10   SKINNER was not exhibiting any symptoms of COVID-19 nor had he been

11   exposed to anyone who had been diagnosed with or who exhibited symptoms of

12   COVID-19. He had not travelled outside the United States in the two weeks prior to

13   boarding.

14   201.   While onboard the M/V GRAND PRINCESS, JEFFREY SKINNER

15   attended events and activities where he was in close proximity to numerous other

16   passengers and crew members.

17   202.   On or around March 7, 2020, JEFFREY SKINNER began to suffer

18   from fever and fatigue.. Mr. Skinner called the crew on the ship for help, but

19   received no assistance or in-person response. Based the timing of the onset of his

20   symptoms and the CDC's definition of a "probable case" of COVID-19, it is more

21   likely than not that JEFFREY SKINNER contracted COVID-19 during the subject

22   voyage.

23   203.   Before boarding the M/V GRAND PRINCESS, Plaintiff ARLINDA

24   PANGILINAN was not exhibiting any symptoms of COVID-19 nor had she been

25   exposed to anyone who had been diagnosed with or who exhibited symptoms of

26   COVID-19. She had not travelled outside the United States in the two weeks prior

27   to boarding.

28

THIRD AMENDED COMPLAINT
No. 2:20-cv-04203-RGK

204.   While onboard the M/V GRAND PRINCESS, ARLINDA PANGILINAN attended events and activities where she was in close proximity to numerous other passengers and crew members, including several whom she later discovered had contracted COVID-19.

205.   On or around March 23, 2020, while she was in quarantine at Travis Air Force Base, ARLINDA PANGILINAN began experiencing an extreme cough, body aches, upset stomach, and fever. She tested positive for COVID-19. Based on her positive test results, the timing of the onset of her symptoms, and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that ARLINDA PANGILINAN contracted COVID-19 during the subject voyage.

206.   Before boarding the M/V GRAND PRINCESS, Plaintiff RIZALINA RUNAS was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside the United States in the two weeks prior to boarding.

207.   While onboard the M/V GRAND PRINCESS, RIZALINA RUNAS attended events and activities where she was in close proximity to numerous other passengers and crew members, including several whom she later discovered had contracted COVID-19.

208.   As a direct and proximate result of Defendants' acts and omissions, between February 21 and March 8, 2020, RIZALINA RUNAS contracted COVID-19. On or around March 8, 2020, RIZALINA RUNAS began to suffer from an extreme cough. Based on the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that RIZALINA RUNAS contracted COVID-19 during the subject voyage.

209.   Before boarding the M/V GRAND PRINCESS, Plaintiff MARISSA SMITH was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside the United States in the two weeks prior to boarding.

210.   While onboard the M/V GRAND PRINCESS, MARISSA SMITH attended events and activities where she was in close proximity to numerous other passengers and crew members, including several whom she later discovered had contracted COVID-19.

211.   On or around February 25, 2020, MARISSA SMITH began experiencing a sore throat, cough and muscle and bone pain. On March 13, 2020, she tested positive for COVID-19. Based on her positive test results and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that MARISSA SMITH contracted COVID-19 during the subject voyage.

212.   Before boarding the M/V GRAND PRINCESS, Plaintiff JULIAN SMITH was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. He had not travelled outside the United States in the two weeks prior to boarding.

213.   While onboard the M/V GRAND PRINCESS, JULIAN SMITH attended events and activities where he was in close proximity to numerous other passengers and crew members, including several whom he later discovered had contracted COVID-19.

214.   On or around March 5, 2020, JULIAN SMITH began experiencing a sore throat, cough and muscle and bone pain. On March 13, 2020, he tested positive for COVID-19. Based on his positive test results, the timing of the onset of his symptoms, and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that JULIAN SMITH contracted COVID-19 during the subject voyage.

215.   Before boarding the M/V GRAND PRINCESS, Plaintiff PATRICIA MCFADDEN was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside the United States in the two weeks prior to boarding.

1    216.   While onboard the M/V GRAND PRINCESS, PATRICIA

2    MCFADDEN attended events and activities where she was in close proximity to

3    numerous other passengers and crew members.

4    217.   On or around February 24, 2020, PATRICIA MCFADDEN began to

5    suffer from a sore throat. Based the timing of the onset of her symptoms and the

6    CDC's definition of a "probable case" of COVID-19, it is more likely than not that

7    PATRICIA MCFADDEN contracted COVID-19 during the subject voyage.

8    218.   Before boarding the M/V GRAND PRINCESS, Plaintiff ALLEN

9    MCFADDEN was not exhibiting any symptoms of COVID-19 nor had he been

10   exposed to anyone who had been diagnosed with or who exhibited symptoms of

11   COVID-19. He had not travelled outside the United States in the two weeks prior to

12   boarding.

13   219.   While onboard the M/V GRAND PRINCESS, ALLEN MCFADDEN

14   attended events and activities where he was in close proximity to numerous other

15   passengers and crew members, including several whom he later discovered had

16   contracted COVID-19.

17   220.   On February 24, 2020, ALLEN MCFADDEN began to suffer from

18   nausea and a loss of appetite. Based the timing of the onset of his symptoms and the

19   CDC's definition of a "probable case" of COVID-19, it is more likely than not that

20   ALLEN MCFADDEN contracted COVID-19 during the subject voyage.

21   221.   Before boarding the M/V GRAND PRINCESS, Plaintiff GLORIA

22   PRESLEY was not exhibiting any symptoms of COVID-19 nor had she been

23   exposed to anyone who had been diagnosed with or who exhibited symptoms of

24   COVID-19. She had not travelled outside the United States in the two weeks prior

25   to boarding.

26   222.   While onboard the M/V GRAND PRINCESS, GLORIA PRESLEY

27   attended events and activities where she was in close proximity to numerous other

28   passengers and crew members.

223.   On or around February 24, GLORIA PRESLEY began to suffer from a cough, body aches, chest tightness, and difficulty sleeping. Based the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that ALLEN MCFADDEN contracted COVID-19 during the subject voyage.

224.   Before boarding the M/V GRAND PRINCESS, Plaintiff JESSE PRESLEY was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. He had not travelled outside the United States in the two weeks prior to boarding.

225.   While onboard the M/V GRAND PRINCESS, JESSE PRESLEY attended events and activities where he was in close proximity to numerous other passengers and crew members.

226.   On or around February 24, 2020, JESSE PRESLEY began to suffer from, among other things, fatigue, body aches, loss of appetite, loss of taste, joint pain, and sweating. Based the timing of the onset of his symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that ALLEN MCFADDEN contracted COVID-19 during the subject voyage.

227.   Before boarding the M/V GRAND PRINCESS, Plaintiff JANIE HARRISON was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside the United States in the two weeks prior to boarding.

228.   While onboard the M/V GRAND PRINCESS, JANIE HARRISON attended events and activities where she was in close proximity to numerous other passengers and crew members.

229.   On or around February 24, 2020, JANIE HARRISON began experiencing a persistent cough. Based the timing of the onset of her symptoms and

the CDC's definition of a "probable case" of COVID-19, it is more likely than not that JANIE HARRISON contracted COVID-19 during the subject voyage.

230.   Before boarding the M/V GRAND PRINCESS, Plaintiff MARIA MAGOS was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside the United States in the two weeks prior to boarding.

231.   While onboard the M/V GRAND PRINCESS, MARIA MAGOS attended events and activities where she was in close proximity to numerous other passengers and crew members.

232.   While still onboard the ship, MARIA MAGOS began suffering from shortness of breath and fatigue. Based the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that MARIA MAGOS contracted COVID-19 during the subject voyage.

233.   Before boarding the M/V GRAND PRINCESS, Plaintiff MIRNA BEKHAZI was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside the United States in the two weeks prior to boarding.

234.   While onboard the M/V GRAND PRINCESS, MIRNA BEKHAZI attended events and activities where she was in close proximity to numerous other passengers and crew members.

235.   While still onboard the ship, MIRNA BEKHAZI began suffering from gastro-intestinal distress, such as constipation. Based the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that MIRNA BEKHAZI contracted COVID-19 during the subject voyage.

236.   Before boarding the M/V GRAND PRINCESS, Plaintiff NANCY ALVIS was not exhibiting any symptoms of COVID-19 nor had she been exposed

1    to anyone who had been diagnosed with or who exhibited symptoms of COVID-19.

2    She had not travelled outside the United States in the two weeks prior to boarding.

3        237.   While onboard the M/V GRAND PRINCESS, NANCY ALVIS

4    attended events and activities where she was in close proximity to numerous other

5    passengers and crew members.

6        238.   On or around February 25, 2020, NANCY ALVIS began experiencing

7    fever, chills, diarrhea, body pain, and difficulty breathing. When she sought

8    medical care on the ship, the only aid she received was ibuprofen that was sent to

9    her cabin. Based the timing of the onset of her symptoms and the CDC's definition

10   of a "probable case" of COVID-19, it is more likely than not that NANCY ALVIS

11   contracted COVID-19 during the subject voyage.

12       239.   Before boarding the M/V GRAND PRINCESS, Plaintiff LEIGH

13   NURRE was not exhibiting any symptoms of COVID-19 nor had she been exposed

14   to anyone who had been diagnosed with or who exhibited symptoms of COVID-19.

15   She had not travelled outside the United States in the two weeks prior to boarding.

16       240.   While onboard the M/V GRAND PRINCESS, LEIGH NURRE

17   attended events and activities where she was in close proximity to numerous other

18   passengers and crew members. She later discovered that the waiter who served her

19   dinner table was ill.

20       241.   On or around March 10, LEIGH NURRE began experiencing

21   shortness of breath, dizziness, sore throat, and other cold-like symptoms. Based the

22   timing of the onset of her symptoms and the CDC's definition of a "probable case"

23   of COVID-19, it is more likely than not that LEIGH NURRE contracted COVID-

24   19 during the subject voyage.

25       242.   As a direct and proximate result of Defendants' acts and omissions—

26   which spurred the outbreak of COVID-19 requiring quarantine—Plaintiff

27   DOROTHY OWEN was forced to go without her heart medication for two weeks

28

1   while she was trapped on the M/V GRAND PRINCESS, exposing her to additional

2   risks and potential long-term effects.

3         243.   Before boarding the M/V GRAND PRINCESS, Plaintiff JORDAN

4   BLYNN was not exhibiting any symptoms of COVID-19 nor had he been exposed

5   to anyone who had been diagnosed with or who exhibited symptoms of COVID-19.

6   He had not travelled outside the United States in the two weeks prior to boarding.

7         244.   While onboard the M/V GRAND PRINCESS, JORDAN BLYNN

8   attended events and activities where he was in close proximity to numerous other

9   passengers and crew members.

10         245.   On or around March 12, 2020, while he was quarantined at Dobbins

11   Air Force Base in Georgia, JORDAN BLYNN began to suffer from a fever, a

12   stomach ache, diarrhea, chills, fatigue, shortness of breath, dizziness and

13   lightheadedness, and confusion. He was diagnosed with pneumonia—a health

14   outcome that develops as a result of COVID-19—and experienced an irregular

15   heartbeat. Based the timing of the onset of his symptoms and the CDC's definition

16   of a "probable case" of COVID-19, it is more likely than not that JORDAN

17   BLYNN contracted COVID-19 during the subject voyage. Since recovering from

18   COVID-19, Mr. Blynn has had a lingering loss of appetite and has experienced

19   altered ability to taste food.

20         246.   Before boarding the M/V GRAND PRINCESS, Plaintiff GENE QIN

21   was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone

22   who had been diagnosed with or who exhibited symptoms of COVID-19. He had

23   not travelled outside the United States in the two weeks prior to boarding.

24         247.   While onboard the M/V GRAND PRINCESS, GENE QIN attended

25   events and activities where he was in close proximity to numerous other passengers

26   and crew members.

27         248.   On or around March 12, 2020, GENE QIN began experiencing an

28   extreme cough and fever. He called the ship medical facility numerous times, but

1    no one came to his cabin for two days. When the medical staff did come to his

2    cabin, they only brought Tylenol. After disembarking, he was hospitalized with

3    pneumonia and tested positive for COVID-19. Based on his positive test results, the

4    timing of the onset of his symptoms, and the CDC's definition of a "probable case"

5    of COVID-19, it is more likely than not that GENE QIN contracted COVID-19

6    during the subject voyage. He still experiences consistent chest pain.

7         249.   Before boarding the M/V GRAND PRINCESS, Plaintiff DIANA

8    GONG was not exhibiting any symptoms of COVID-19 nor had she been exposed

9    to anyone who had been diagnosed with or who exhibited symptoms of COVID-19.

10   She had not travelled outside the United States in the two weeks prior to boarding.

11        250.   While onboard the M/V GRAND PRINCESS, DIANA GONG

12   attended events and activities where she was in close proximity to numerous other

13   passengers and crew members.

14        251.   On or around March 12, 2020, DIANA GONG began suffering from a

15   fever and cough. On or around April 7, 2020, she tested positive for COVID-19

16   antibodies. Based on her positive test results, the timing of the onset of her

17   symptoms, and the CDC's definition of a "probable case" of COVID-19, it is more

18   likely than not that DIANA GONG contracted COVID-19 during the subject

19   voyage.

20        252.   As a direct and proximate result of Defendants' acts and omissions,

21   Plaintiff GARY PILGRAM has suffered from post-traumatic stress disorder

22   associated with his experience on the M/V GRAND PRINCESS.

23        253.   Before boarding the M/V GRAND PRINCESS, Plaintiff SHARON

24   PILGRAM was not exhibiting any symptoms of COVID-19 nor had she been

25   exposed to anyone who had been diagnosed with or who exhibited symptoms of

26   COVID-19. She had not travelled outside the United States in the two weeks prior

27   to boarding.

28

254.   While onboard the M/V GRAND PRINCESS, SHARON PILGRAM attended events and activities where she was in close proximity to numerous other passengers and crew members.

255.   On or around March 11, 2020, SHARON PILGRAM  began to suffer from body aches (including back pain and decreased mobility) and circulatory problems, including claudication, which is cramping caused by obstruction of the arteries. The results of an MRI Ms. Pilgram had done indicated that she will require surgical bilateral blocks to treat these conditions. Based on the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that SHARON PILGRAM contracted COVID-19 during the subject voyage. In the wake of her experience on the M/V GRAND PRINCESS, she suffers extreme anxiety and post-traumatic stress disorder.

256.   Before boarding the M/V GRAND PRINCESS, Plaintiff BILL J. EADS, SR. was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. He had not travelled outside the United States in the two weeks prior to boarding.

257.   While onboard the M/V GRAND PRINCESS, BILL J. EADS, SR. attended events and activities where he was in close proximity to numerous other passengers and crew members.

258.   On March 18, 2020, BILL J. EADS, SR. had a stroke in his brain stem. Based on the timing of the onset of his symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that BILL J. EADS, SR. contracted COVID-19 during the subject voyage.

259.   Before boarding the M/V GRAND PRINCESS, Plaintiff EDNA PELAYO was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of

1  COVID-19. She had not travelled outside the United States in the two weeks prior

2  to boarding.

3      260.   While onboard the M/V GRAND PRINCESS, EDNA PELAYO

4  attended events and activities where she was in close proximity to numerous other

5  passengers and crew members.

6      261.   On or around March 22, 2020, EDNA PELAYO began suffering from

7  a fever and cough. After disembarking from the M/V GRAND PRINCESS, she was

8  taken by ambulance to Kaiser Permanente, where she was admitted to the intensive

9  care unit, intubated, sedated, and given tube feedings. While there, she tested

10 positive for COVID-19. She was discharged from the hospital on April 16, 2020,

11 and remains dependent on oxygen. Based on her positive test results, the timing of

12 the onset of her symptoms, and the CDC's definition of a "probable case" of

13 COVID-19, it is more likely than not that EDNA PELAYO contracted COVID-19

14 during the subject voyage.

15     262.   Before boarding the M/V GRAND PRINCESS, Plaintiff NICHOLAS

16 ALLEN was not exhibiting any symptoms of COVID-19 nor had he been exposed

17 to anyone who had been diagnosed with or who exhibited symptoms of COVID-19.

18 He had not travelled outside the United States in the two weeks prior to boarding.

19     263.   While onboard the M/V GRAND PRINCESS, NICHOLAS ALLEN

20 attended events and activities where he was in close proximity to numerous other

21 passengers and crew members.

22     264.   On March 13, 2020, NICHOLAS ALLEN began suffering from a

23 fever and chills. Based on the timing of the onset of his symptoms and the CDC's

24 definition of a "probable case" of COVID-19, it is more likely than not that

25 NICHOLAS ALLEN contracted COVID-19 during the subject voyage.

26     265.   Before boarding the M/V GRAND PRINCESS, Plaintiff ANNA

27 ALLEN was not exhibiting any symptoms of COVID-19 nor had she been exposed

28

1  to anyone who had been diagnosed with or who exhibited symptoms of COVID-19.

2  She had not travelled outside the United States in the two weeks prior to boarding.

3      266.  While onboard the M/V GRAND PRINCESS, ANNA ALLEN

4  attended events and activities where she was in close proximity to numerous other

5  passengers and crew members.

6      267.  On March 7, 2020, ANNA ALLEN began suffering from a cough and

7  a sore throat, body aches, diarrhea, and fatigue. Based on the timing of the onset of

8  her symptoms and the CDC's definition of a "probable case" of COVID-19, it is

9  more likely than not that ANNA ALLEN contracted COVID-19 during the subject

10  voyage.

11      268.  Before boarding the M/V GRAND PRINCESS, Plaintiff MARITESS

12  MILLER was not exhibiting any symptoms of COVID-19 nor had she been

13  exposed to anyone who had been diagnosed with or who exhibited symptoms of

14  COVID-19. She had not travelled outside the United States in the two weeks prior

15  to boarding.

16      269.  While onboard the M/V GRAND PRINCESS, MARITESS MILLER

17  attended events and activities where she was in close proximity to numerous other

18  passengers and crew members.

19      270.  On February 25, 2020, MARITESS MILLER began suffering from a

20  cough and a headache. Based on the timing of the onset of her symptoms and the

21  CDC's definition of a "probable case" of COVID-19, it is more likely than not that

22  MARITESS MILLER contracted COVID-19 during the subject voyage.

23      271.  As a direct and proximate result of their negligence and gross

24  negligence Defendants exposed Plaintiffs and Class Members to COVID-19, actual

25  risk of immediate physical injury, and, in many cases, already-manifested actual

26  physical injury.  As a direct and proximate result of their exposure to COVID-19,

27  Plaintiffs and Class Members have suffered physical injuries as described above, as

28  well as emotional distress of the nature and type that reasonable persons would

1   suffer under the circumstances alleged in this Complaint, including, but not limited

2   to, suffering anguish, fright, horror, nervousness, grief, anxiety, worry, shock,

3   humiliation and shame.

4       272.   In addition, Plaintiffs and Class Members were traumatized by their

5   direct exposure to COVID-19, the risk that they would contract the virus, and the

6   reasonable apprehension associated with that risk, as well as by their confinement

7   on an infected vessel in isolation and for two weeks, on military bases, in some

8   cases knowing that their friends and loved ones were suffering from, or could

9   contract, a potentially lethal illness.

10       273.   Furthermore, as noted above, public health experts and physicians

11   continue to learn more about the myriad ways COVID-19 attacks and damages the

12   body, including long-lasting harms to the cardio-vascular system,[52] and to the

13   kidneys, liver, and neurological system, potentially even in "asymptomatic"

14   patients.

15       274.   Plaintiffs and Class Members develop new and evolving medical

16   concerns and uncertainties that require and will continue to require medical

17   diagnostic exams. Plaintiffs and the Class Members are suffering and will continue

18   to suffer due to the ever-present anxiety and reasonable apprehension that they will

19   or may later experience negative health outcomes or complications as a direct and

20   proximate result of being exposed to COVID-19 because of Defendants' negligent

21   and grossly negligent acts and omissions.

22       275.   It is expected that, as a result of Defendants' negligence and gross

23   negligence, they will continue to suffer and will, in the future, require medical

24

25

26   [52] Valentina O. Puntmann, et al., Outcomes of Cardiovascular Magnetic Resonance
     Imaging in Patients Recently Recovered From Coronavirus Disease 2019 (COVID-
27   19), JAMA Cardiology, July 27, 2020,
     https://jamanetwork.com/journals/jamacardiology/fullarticle/2768916 (last visited
28   August 12, 2020).

1   services outside of the kinds accepted as part of the typical wear and tear of daily

2   life.

3   **REQUEST FOR INJUNCTIVE RELIEF**

4   276.   Plaintiffs traveled on the M/V GRAND PRINCESS, a cruise ship

5   owned and operated by CARNIVAL and PRINCESS. In the future, Plaintiffs

6   would like to go on cruises again, including cruises operated by Defendants, if

7   corrective action is taken such that Plaintiffs can reasonably rely on Defendants to

8   protect their health and safety.

9   277.   For example, on March 3, 2020, while they were onboard the M/V

10   GRAND PRINCESS, Plaintiffs ROBERT ARCHER, MARLENE ARCHER,

11   MICHAEL GIUSTI, PAMELA GIUSTI, JACQUELINE GRAHAM, ROBERT

12   GRAHAM, and VALERIE WILLSEA booked and intend to take a PRINCESS

13   cruise to Australia and New Zealand in February 2021, if, among other things,

14   Defendants implement effective policies to protect the health and safety of their

15   passengers.

16   278.   While she was onboard the M/V GRAND PRINCESS, Plaintiff

17   SUZANNE SUWANDA booked and intends to take a cruise to PRINCESS cruise

18   to Mexico for February 2021, if, among other things, Defendants implement

19   effective policies to protect the health and safety of their passengers.

20   279.   Plaintiff KATHERINE HINTON have booked and intends to take a

21   PRINCESS cruise to the Caribbean for March, 2021, if, among other things,

22   Defendants implement effective policies to protect the health and safety of their

23   passengers.

24   280.   Plaintiffs ALLEN McFADDEN and PATRICIA McFADDEN have

25   booked a PRINCESS cruise to Morocco in 2021, if, among other things,

26   Defendants implement effective policies to protect the health and safety of their

27   passengers.

28

281.   Plaintiffs GARY PILGRAM and SHANNON PILGRAM have booked and intend to take a PRINCESS cruise to South America in 2021, if, among other things, Defendants implement effective policies to protect the health and safety of their passengers.

282.   Plaintiffs SAMUEL ARREAGA and HILDA ARREAGA have planned and intend to take a PRINCESS cruise to the Panama Canal in September 2021, if, among other things, Defendants implement effective policies to protect the health and safety of their passengers.

283.   Plaintiffs CHARLES NURRE and LEIGH NURRE have planned and intend to take a PRINCESS cruise to Greece in 2021, if, among other things, Defendants implement effective policies to protect the health and safety of their passengers.

284.   Plaintiffs JORDAN BLYNN and AMY ROTHMAN accepted an offer from Defendants of a $100 per person room credit toward future PRINCESS cruises. They intend to use this credit on a future cruise if, among other things, Defendants implement effective policies to protect the health and safety of their passengers.

285.   For passengers of the M/V GRAND PRINCESS during the Covid-infested cruises, CARNIVAL and PRINCESS provided passengers on the a 100% "Future Cruise Credit," equal to the value that the passengers spent for the Covid-infested cruise, which credit must be used before March 31, 2021. If passengers do not use the credit for a CARNIVAL cruise by March 31, 2021, then the passenger forfeits the full value of the cruise. This underscores that CARNIVAL and PRINCESS fully expect that passengers, including Plaintiffs, will embark on a CARNIVAL/PRINCESS cruise in the near future.

286.   Without accurate and necessary information from CARNIVAL and PRINCESS regarding the risks of exposure onboard their vessel(s), recent exposure or potential exposure of passengers and crew members onboard their vessel(s), and

1  whether CARNIVAL and PRINCESS have any reason to believe that their

2  vessel(s) may be infested with COVID-19 or other communicable disease,

3  Plaintiffs will not be able to make informed decisions about whether to travel on

4  cruises operated by CARNIVAL and PRINCESS.

5      287.   Another critical concern for Plaintiffs, who plan to take cruises again

6  when they are able to do so, is whether they can rely on PRINCESS and

7  CARNIVAL to faithfully inform Plaintiffs and other future cruise passengers about

8  potential safety hazards, including and especially viral outbreaks, and whether

9  PRINCESS and CARNIVAL will take reasonable and necessary steps to protect

10  from and mitigate risks and harms associated with communicable diseases,

11  including COVID-19.

12      288.   This concern is especially acute for Plaintiffs here in light of the

13  multiple outbreaks experienced by passengers onboard vessels owned by

14  PRINCESS and CARNIVAL, including but not limited to the M/V GRAND

15  PRINCESS. Plaintiffs also expect that, absent an injunction, they will experience

16  future injury because CARNIVAL and PRINCESS previously asserted their

17  commitment to passengers' safety, well-being, and comfort and assured certain

18  Plaintiffs that they would institute particular screening measures, but then failed to

19  do so, and failed to take other effective measures to ensure that Plaintiffs were not

20  exposed to COVID-19.

21      289.   Moreover, CARNIVAL and PRINCESS's actions and omissions

22  exacerbated and hastened the spread of COVID-19 onboard the M/V GRAND

23  PRINCESS, exposing Plaintiffs to a potentially-lethal viral contagion.

24      290.   Plaintiffs face a real threat that, absent an injunction, they are likely to

25  be subject to the same acts and omissions by CARNIVAL and PRINCESS that will

26  once again expose them to COVID-19 and/or other communicable disease that will

27  cause them injury and emotional harms.

28

291.   CARNIVAL's and PRINCESS's ongoing adherence to their HESS policy and their implementation of additional effective measures specifically to protect passengers from contracting COVID-19 is and will continue to be a substantial, necessary, and material factor in Plaintiffs' taking future cruises. Without injunctive relief, Plaintiffs cannot be assured that CARNIVAL and PRINCESS will discharge their duty to Plaintiffs on future cruises and/or that they will abide by the representations and assurances that they have made to Plaintiffs, and are likely to once again suffer harms like those alleged in this Complaint.

## NOTICE

292.   Section 16(A)(i) of the Passage Contract purports to require that claimants provide notice to PRINCESS and CARNIVAL of any potential claims. Although Plaintiffs do not concede that this provision is enforceable, Plaintiffs and Class Members have complied with this requirement by providing written notice to Defendants' electronically on April 7, 2020; April 20, 2020; April 27, 2020; May 1, 2020.

## CLASS ACTION ALLEGATIONS

293.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all similarly-situated persons pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1), (b)(2), (b)(3), and/or (c)(4). This action satisfies the applicable numerosity, commonality, typicality, adequacy, predominance, and/or superiority requirements of those provisions.

294.   The proposed Class is defined as follows:  All persons in the United States, who sailed as passengers on the M/V GRAND PRINCESS cruise from San Francisco, California, leaving on February 21, 2020, roundtrip to Hawaii.

295.   Excluded from the proposed Class are: (1) CARNIVAL and PRINCESS, any entity or division in which either have a controlling interest, and its legal representatives, officers, directors, assigns and successors; (2) the judicial officer(s) to whom this case is assigned and the judicial officer(s)' immediate

1  family and legal staff; and (3) governmental entities. Plaintiffs reserve the right to

2  amend the Class definition if discovery and further investigation reveal that the

3  Class should be expanded, otherwise divided into subclasses, or modified in any

4  other way.

5       296.   The individual Plaintiffs named in this complaint support the use of the

6  class action mechanism to achieve economy, efficiency, fairness and consistency of

7  result by determining the important common questions raised in this action on a

8  common basis.

9       **A.**   **Numerosity**

10      297.   There were, on information and belief, approximately 2,422

11  passengers on the M/V GRAND PRINCESS for the cruise that is the subject of this

12  action. Their exact number and identities can be readily ascertained from

13  Defendants' records. The individual joinder of all passengers is impractical, and the

14  class action procedure is more practical, cost-effective, inclusive, and efficient than

15  multiple lawsuits on the common questions of law and fact that unite the class, or

16  piecemeal and incomplete individual joinder. The disposition of the claims of these

17  Class Members in a single action will provide substantial benefits to all parties and

18  to the Court. Class Members are readily identifiable from information and records

19  in PRINCESS'S possession, custody, or control, as well as from records kept by the

20  Department of Health and Human Services.

21      **B.**   **Typicality**

22      298.   The claims of Plaintiffs are typical of the claims of Class Members in

23  that Plaintiffs, like all Class Members, sailed on the leg of the M/V GRAND

24  PRINCESS cruise that began on February 21, 2020. Plaintiffs, like all Class

25  Members, have been damaged by Defendants' misconduct in that they sailed on a

26  cruise they would not have sailed on and suffered significant injury, emotional

27  distress and economic damage, including medical monitoring, caused by the

28  negligence of the Defendants. The factual bases of CARNIVAL and PRINCESS's

1    misconduct are common to all Class Members and represent a common thread of
2    misconduct resulting in injury to all Class Members.

3         **C.    Adequate Representation**

4         299.   Plaintiffs ROBERT ARCHER, MARLENE ARCHER, PAMELA
5    GIUSTI, MICHAEL GIUSTI, JACQUELINE GRAHAM, ROBERT GRAHAM,
6    VALERIE PASQUINI WILLSEA, MICHAEL R. NEKY, GINA M. PALLOTTA,
7    JOSEPH CLARK, VIOLA CLARK, RAUL PANGILINAN, DENCY
8    PANGILINAN, AMY ROTHMAN, JORDAN BLYNN, JOSEPH BALLIN,
9    VICTORIA BALLIN, DAVID LEANDRES, and DIANNE LEANDRES will fairly
10   and adequately represent and protect the interests of the Class Members. Plaintiffs
11   ROBERT ARCHER, MARLENE ARCHER, PAMELA GIUSTI, MICHAEL
12   GIUSTI, JACQUELINE GRAHAM, ROBERT GRAHAM, VALERIE PASQUINI
13   WILLSEA, MICHAEL R. NEKY, GINA M. PALLOTTA, JOSEPH CLARK,
14   VIOLA CLARK, RAUL PANGILINAN, DENCY PANGILINAN, AMY
15   ROTHMAN, JORDAN BLYNN, JOSEPH BALLIN, VICTORIA BALLIN, DAVID
16   LEANDRES, and DIANNE LEANDRES have retained counsel with substantial
17   experience in prosecuting class actions, aggregate suits, and mass torts.

18        300.   Plaintiffs ROBERT ARCHER, MARLENE ARCHER, PAMELA
19   GIUSTI, MICHAEL GIUSTI, JACQUELINE GRAHAM, ROBERT GRAHAM,
20   VALERIE PASQUINI WILLSEA, MICHAEL R. NEKY, GINA M. PALLOTTA,
21   JOSEPH CLARK, VIOLA CLARK, RAUL PANGILINAN, DENCY
22   PANGILINAN, AMY ROTHMAN, JORDAN BLYNN, JOSEPH BALLIN,
23   VICTORIA BALLIN, DAVID LEANDRES, and DIANNE LEANDRES and their
24   counsel are committed to vigorously prosecuting this action on behalf of all Class
25   Members, and have the financial resources to do so. Neither Plaintiffs ROBERT
26   ARCHER, MARLENE ARCHER, PAMELA GIUSTI, MICHAEL GIUSTI,
27   JACQUELINE GRAHAM, ROBERT GRAHAM, VALERIE PASQUINI
28   WILLSEA, MICHAEL R. NEKY, GINA M. PALLOTTA, JOSEPH CLARK,

1  VIOLA CLARK, RAUL PANGILINAN, DENCY PANGILINAN, AMY
2  ROTHMAN, JORDAN BLYNN, JOSEPH BALLIN, VICTORIA BALLIN, DAVID
3  LEANDRES, and DIANNE LEANDRES nor their counsel have interests adverse to
4  those of the Class Members.

5       **D.**    **Predominance of Common Issues**

6      301.   There are numerous questions of law and fact, including those related
7  to Defendants' knowledge, conduct, and duty throughout the events described in
8  this Complaint, common to Plaintiffs and Class Members that predominate over
9  any question affecting only individual Class Members, the answers to which will
10  advance resolution of the litigation as to all Class Members. These common legal
11  and factual issues include, *inter alia*:

12         a.    what Defendants knew about the presence and risks associated
13  with the COVID-19 virus, and contagions generally, and when they knew it;

14         b.    whether Defendants should have canceled the subject cruise to
15  avoid exposing passengers to a deadly pathogen and/or taken other steps to avoid
16  exposing passengers to a deadly pathogen, such as imposing social distancing
17  requirements, eliminating mass gatherings, and quarantining, ;

18         c.    whether Defendants had a duty to decontaminate the M/V
19  GRAND PRINCESS after they knew or should have known that individuals who
20  had been aboard the M/V GRAND PRINCESS prior to the subject cruise were or
21  were potentially carriers of the COVID-19 virus, and/or after it had been disclosed
22  prior to embarking on the subject leg of the cruise that passengers on the
23  DIAMOND PRINCESS had perished due to the COVID-19 virus;

24         d.    whether Defendants knew or should have known that passengers
25  and crew who had been aboard the M/V GRAND PRINCESS prior to the subject
26  cruise were exposed to or were potentially carriers of the COVID-19 virus;

27         e.    whether the fact that prior passengers and crew had been
28  exposed to or were potential carriers of the COVID-19 virus constitutes a material

fact reasonable consumers would have considered in deciding whether to embark on the subject cruise;

f.      whether Defendants had a duty to disclose that passengers and crew who had been aboard the M/V GRAND PRINCESS prior to the subject cruise were exposed to or were potentially carriers of the COVID-19 virus, and other relevant information;

g.      whether Defendants failed to disclose that passengers and crew who had been aboard the M/V GRAND PRINCESS prior to the subject cruise were or were potentially carriers of the COVID-19 virus and other relevant information;

h.      interpretation of the applicable contract documents and the associated "Passenger Bill of Rights" incorporated therein;

i.      whether Defendants acted as alter egos and/or agents, such that they should be held jointly liable for the conduct alleged herein;

j.      whether CARNIVAL is liable for the acts, omissions, and violations described in this Complaint;

k.      whether PRINCESS is liable for the acts, omissions, and violations described in this Complaint; and

l.      whether the conduct of any or all of the defendants warrants the imposition of punitive damages to vindicate the societal interest in punishment and deterrence.

**E.      <u>Superiority</u>**

302.   Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of CARNIVAL's and PRINCESS's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

303.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class

1    Members' claims (compared to the cost of litigation), it is likely that only a few

2    Class Members could afford to seek legal redress for Defendants' misconduct.

3    Absent a class action, Class Members will continue to incur damages, and

4    Defendants' misconduct will continue without remedy.

5         304.   Class treatment of common questions of law and fact is superior to

6    other available procedures, such as multiple individual actions or piecemeal

7    litigation because class treatment will conserve the resources of the courts and the

8    litigants, and will promote consistency and efficiency of adjudication.

9         **F.   Limited Fund**

10        305.   In an abundance of caution, Plaintiffs take note of the presently

11   apparent financial circumstances of CARNIVAL and/or PRINCESS to allege the

12   possibility that their assets and resources available to fairly compensate Plaintiffs

13   and Class Members, to satisfy appropriate punitive damages awards, and/or

14   otherwise fairly address the claims against them may constitute a "limited fund"

15   within the meaning of *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), such that

16   class certification under Rule 23(b)(1)(B) is necessary and appropriate as a matter

17   of due process and equity.

18        **G.   Mass Action**

19        306.   In the alternative, this matter should proceed as a mass action, as

20   defined in 28 U.S.C. § 1332 (d)(11)(B)(i) and should be tried jointly on the ground

21   that plaintiffs' claims involve common questions of law or fact, including as set

22   forth above.

23        307.   Plaintiffs' individual claims exceed the required jurisdictional amount

24   of $75,000.00.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**NEGLIGENCE AGAINST ALL DEFENDANTS**

308.   Plaintiffs re-allege all allegations in paragraphs 1 through 233 as if alleged fully herein.

309.   Defendants CARNIVAL and PRINCESS owed Plaintiffs, and the Class, who were passengers who boarded the M/V GRAND PRINCESS on February 21, 2020 and who Defendants therefore had a custodial relationship over, a duty to ensure that they would not be exposed to an unreasonable risk of harm.

310.   CARNIVAL and PRINCESS held themselves out as committed to and responsible for ensuring the health and safety of their vessels and the passengers onboard those vessels—including the M/V GRAND PRINCESS. Plaintiffs and Class members took Defendants at their word and put themselves in Defendants hands for the full duration of the voyage that is the subject of this Complaint. Plaintiffs and Class members relied on Defendants to ensure their security. Thus, Defendants owed Plaintiffs and the Class a duty to take actions to prevent and mitigate the risk of threats to passengers' health and safety, including by ensuring that the M/V GRAND PRINCESS was properly cleaned, disinfected, and safely maintained. Furthermore, Defendants owed Plaintiffs and Class members a duty to not take actions that would exacerbate the spread and threat of COVID-19 onboard the ship.

311.   Defendants knew or should have known the unique conditions aboard cruise ships that create a particular risk of viral outbreak. Defendants knew or should have known that cruise ships owned and operated by Defendants had been the sites of prior, lethal outbreaks of COVID-19, and should have been aware of new guidelines for the cruise industry published by Dr. Hadjichristoulou and a team of European experts on February 3, 2020. In particular, Defendants had knowledge

1    of the actual risks facing passengers based on the outbreak of the virus on the

2    DIAMOND PRINCESS a mere three weeks prior to the instant outbreak.

3        312.   Defendants knew or should have known that passengers traveling on

4    the M/V GRAND PRINCESS had suffered COVID-19 symptoms and that

5    passengers aboard the M/V GRAND PRINCESS's San Francisco-Mexico voyage

6    who remained onboard the vessel for the instant voyage were or could have been

7    exposed to and were or could have been carriers of the virus.

8        313.   Defendants knew or should have known that crew members aboard the

9    M/V GRAND PRINCESS were or could have been exposed to COVID-19 and

10   were or could have been carriers of the virus.

11       314.   Defendants failed to do what a reasonably careful cruise ship owner

12   and operator would do under the circumstances.

13       315.   Defendants breached their duty to Plaintiffs and the Class when, with

14   the aforementioned knowledge, Defendants nevertheless chose to embark on the

15   San Francisco-Hawaii voyage.

16       316.   Defendants also breached their duties when, with that same

17   knowledge, they chose not to screen or medically examine any passengers or crew,

18   including the approximately sixty-two passengers and over 1,000 crew members

19   who had traveled on the San Francisco-Mexico trip and were also traveling on the

20   San Francisco-Hawaii trip.

21       317.   Defendants further breached their duties to Plaintiffs and the Class

22   when, with the above-mentioned knowledge, Defendants boarded, without

23   additional decontamination and screening protocols, Plaintiffs and the Class onto

24   the likely infested ship and negligently chose not to notify Plaintiffs and the Class

25   of:  the actual risk that the ship was infested with COVID-19 due to prior

26   passengers' infections; the actual and extreme risks of contracting COVID-19 while

27   using facilities on the vessel; and/or the actual and extreme risks of contracting

28

1   COVID-19 while interacting with passengers and crew who had traveled on the

2   Mexico voyage.

3       318.   Additionally, Defendants breached their duties to Plaintiffs and the

4   Class when, on or before February 25, 2020, Defendants repeatedly failed to notify

5   passengers aboard the M/V GRAND PRINCESS during the San Francisco-Hawaii

6   voyage that passengers on the Mexico voyage had been diagnosed with COVID-19,

7   that one had died, and that certain passengers and crew from that trip remained

8   onboard the M/V GRAND PRINCESS.

9       319.   If Defendants had adequately informed Plaintiffs and the Class prior to

10  boarding, or at any other time, of the relevant information in Defendants'

11  possession, including facts regarding the M/V GRAND PRINCESS, its prior

12  passengers, continuing passengers and crew, lack of adequate screening, lack of

13  adequate disinfecting procedures, lack of adequate quarantining procedures, and the

14  actual risk of exposure, Plaintiffs and the Class could have made informed

15  decisions about their health and their families' health, including disembarking from

16  or not boarding the vessel.

17      320.   Defendants repeatedly breached their duties to Plaintiffs and the Class

18  when, throughout the San Francisco-Hawaii voyage, with the aforementioned

19  knowledge, they repeatedly chose not to inform Plaintiffs of the continuing and

20  growing risks of contracting COVID-19, and chose not to provide Plaintiffs with

21  the informed option to disembark at one of the vessel's ports of call.

22      321.   Finally, Defendants continued to breach their duties to Plaintiffs and

23  the Class when, throughout the duration of the M/V GRAND PRINCESS's San

24  Francisco-Hawaii voyage, with the aforementioned knowledge and without any

25  warning to Plaintiffs and the Class, they, *inter alia*, chose not to implement

26  quarantine or social distancing protocols; chose to continue operating large, public

27  gatherings and meals; chose to continue to operate daily turndown service; and

28  chose to continue hosting communal activities.

322.   As a direct and proximate result of Defendants' breach of their duties of care, Plaintiffs experienced COVID-19-associated symptoms as described above in paragraphs 169 through 201.

323.   As a direct and proximate result of PRINCESS's and CARNIVAL'S failure to safeguard Plaintiffs and the class, and as a direct and proximate result of PRINCESS's and CARNIVAL's other acts and omissions as laid out herein, Plaintiffs were directly exposed COVID-19 and to actual risk of immediate physical injury, Plaintiffs and the Class have suffered physical injury, emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame. They were traumatized by the reasonable apprehension of developing COVID-19. They were confined on an infected vessel in isolation and then were confined at Travis Air Force Base for two weeks. It is expected that they will continue to suffer and will, in the future, require medical services not of a kind generally anticipated as part of the effects of daily life.

**SECOND CAUSE OF ACTION**
**GROSS NEGLIGENCE AGAINST ALL DEFENDANTS**

324.   Plaintiffs re-allege all allegations in paragraphs 1 through 233 as if alleged fully herein.

325.   Defendants PRINCESS and CARNIVAL owed duties to Plaintiffs and the Class to:  safeguard against and mitigate the risks of passenger injury and illness; appropriately disinfect and sanitize the M/V GRAND PRINCESS, in light of the circumstances of a global pandemic; notify Plaintiffs and the Class of the actual and especially high risk of contracting COVID-19 aboard the M/V GRAND PRINCESS; disembark passengers and crew members who had likely come into contact with individuals infected with COVID-19;and implement medical screening and examination protocols for crew and passengers.

326.   Defendants knew of the unreasonably high risk of viral contagion of COVID-19 on cruise ships, and Defendants knew that it was especially dangerous to expose Plaintiffs and the rest of the Class to COVID-19 in light of the situation on the DIAMOND PRINCESS off the coast of Japan only 3 weeks prior.

327.   Defendants' conduct in deciding to continue to operate the M/V GRAND PRINCESS with Plaintiffs and the Class aboard, even with the aforementioned knowledge, demonstrates an intentional failure to do what a reasonably careful cruise ship owner and operator would do under the circumstances, exhibits a willful and conscious disregard for the safety of Plaintiffs and the Class, and evidences recklessness and indifference by Defendants, which constitutes gross negligence.

328.   Defendants' failure to abide by the guidelines issued on February 3, 2020, by not disembarking, on February 21, 2020, passengers known to have been in casual contact with individuals who reported COVID-19 symptoms constitutes a failure to provide even a modicum of care to Plaintiffs and the Class. Furthermore, the continued and repeated choice not to quarantine or otherwise shelter in their cabins the passengers and crew members who traveled on the San Francisco-Mexico voyage demonstrates a willful and conscious disregard for the rights and safety of others and amounts to an extreme departure of what a reasonably careful cruise ship owner and operator would do.

329.   Defendants' choice not to warn Plaintiffs and the Class of their actual risk of harm in being exposed to COVID-19, either prior to boarding or while they were already on board, in light of the prior passenger who came down with symptoms and later died, along with others from that prior voyage that exhibited symptoms, and the crew member who disembarked during this voyage due to COVID-19-related illness, constitutes a failure to provide even a modicum of care to Plaintiffs and the Class. The continued and repeated choice not to provide passengers with notice of the actual risks facing them demonstrates a willful and

conscious disregard for the rights and safety of others and amounts to an extreme departure of what a reasonably careful cruise ship owner and/or operator would do.

330. Moreover, Defendants' behavior demonstrated a willful and conscious disregard for the rights and safety of others, and an extreme departure of what a reasonably careful cruise ship owner and/or operator would do in their continued and repeated choices to: not effectively sanitize and disinfect the M/V GRAND PRINCESS, either before or during the San Francisco-Hawaii voyage; not institute medical screening and examinations for passengers and crew members; host large social gatherings and meals; conduct daily turn-down service; and not implement quarantine or social distance protocols until March 5, 2020. These decisions manifest Defendants' utter failure to provide even a modicum of care to Plaintiffs and the Class.

331. Defendants chose to place profits over people, including the safety of their passengers, crew, and the general public in continuing to operate business as usual, despite their knowledge of the actual—potentially lethal—risk to Plaintiffs and the Class.

332. Indeed, as a direct and proximate result of Defendants' extreme departure from the ordinary standard of care and their failure to meet their duties of care to Plaintiffs and the Class by providing even scant care, Plaintiff s experienced COVID-19-associated symptoms as described in paragraphs 169 through 201.

333. Finally, as a direct and proximate result of Defendants' gross negligence Plaintiffs and the Class were directly exposed to COVID-19, placed at actual, continual risk of immediate, and potentially fatal, physical injury. Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame. They were traumatized by the reasonable apprehension of developing COVID-19. They were confined on an

infected vessel in isolation and then were confined at federal facilities, including Travis Air Force Base, for approximately two weeks. It is expected that they will continue to suffer and will, in the future, require medical services not of a kind generally accepted as a typical part of daily life.

**THIRD CAUSE OF ACTION**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

334.   Plaintiffs re-allege all allegations in paragraphs 1 through 233 as if alleged fully herein.

335.   Defendants CARNIVAL and PRINCESS knew or should have known of the actual, unique risk of viral contagion of COVID-19 aboard cruise ships, and, in light of the situation on the DIAMOND PRINCESS only 3 weeks prior to the instant voyage on the M/V GRAND PRINCESS, Defendants knew or should have known that it was especially dangerous to expose Plaintiffs and the rest of the Class to COVID-19.

336.   Defendants also knew or should have known that passengers aboard the San Francisco-to-Mexico trip on the M/V GRAND PRINCESS had experienced symptoms of COVID-19 and were eventually diagnosed with COVID-19.

337.   Nevertheless, Defendants chose to board Plaintiffs and the Class onto the M/V GRAND PRINCESS on February 21, 2020 without instituting any procedures for medical screening or examination. Defendants then chose to embark upon the Hawaii-bound voyage, essentially trapping Plaintiffs and the Class on a vessel infested with COVID-19, and likely exacerbated the spread of the virus aboard the ship. Throughout the duration of the trip, Defendants continually and repeatedly acted or failed to act in ways that caused Plaintiffs to be exposed to COVID-19, including but not limited to:  failing to take any effective actions to prevent or mitigate the spread of COVID-19 throughout the crew members and/or passengers; failing to alert passengers to the possibility of infection aboard the ship; and hosting and encouraging participation in large group activities and events that

1    Defendants knew could lead to large-scale infection among the crew and

2    passengers.

3        338.  These choices by Defendants created a dangerous and threatening

4    environment in which Plaintiffs and the Class were forced to live for two weeks, at

5    all times directly exposed to COVID-19 and at risk of becoming infected with,

6    made ill by, and/or spreading COVID-19.

7        339.  As the direct and proximate result of Defendants' actions and

8    omissions throughout the duration of their voyage aboard the M/V GRAND

9    PRINCESS, Plaintiffs and members of the Class were in the "zone of danger,"

10   where they were directly exposed to a potentially-lethal virus, and placed at

11   immediate risk of—and actually suffered—actual physical harm as a result of their

12   direct and prolonged exposure to COVID-19.

13       340.  As a result of this exposure, which was directly and proximately

14   caused by Defendants' acts and omissions, Plaintiffs and members of the Class

15   experienced severe psychic injuries, of the nature and type that reasonable persons

16   would suffer under the circumstances alleged in this Complaint, when they were

17   forced to watch first hand as their friends and family members became ill with

18   COVID-19, were concerned for their own safety and well-being, and continue to

19   expect that they may begin exhibiting symptoms or health complications not yet

20   identified as a result of COVID-19. Plaintiffs suffered physical and emotional

21   injury as the direct and proximate result of Defendants' misconduct.

22       341.  As a direct and proximate result of Defendants' extreme departure

23   from the ordinary standard of care and their failure to meet their duties of care to

24   Plaintiffs and the Class by providing even scant care, Plaintiffs experienced

25   physical harms in the form of COVID-19-associated symptoms and negative health

26   outcomes as described in paragraphs 169 through 201.

27       342.  Finally, as a direct and proximate result of Defendants' gross

28   negligence, Plaintiffs and the Class were exposed to COVID-19 and threatened

with serious physical injury. As a result, Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame related to their own risk of contracting COVID-19 and the suffering they witnessed among their fellow passengers who contracted COVID-19. Plaintiffs and members of the class were traumatized by the reasonable apprehension of their family members, friends and fellow passengers developing COVID-19 and by the threat to their own health of becoming infected with the virus or suffering future negative health outcomes or complications related to exposure to and / or contraction of the virus.

343. Plaintiffs and Class members were endangered and harmed by Defendants' actions when they were forced into confinement on an infested vessel. That danger and harm continued when they were confined at federal facilities, including Travis Air Force Base, for approximately two weeks, as a result of the threat of viral outbreak created by Defendants' actions. It is expected that Plaintiffs and the Class will continue to suffer and will, in the future, require medical services not of a kind generally anticipated as a typical part of daily life.

**FOURTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

344. Plaintiffs re-allege all allegations in paragraphs 1 through 233 as if alleged fully herein.

345. CARNIVAL AND PRINCESS knew or should have known of unique conditions aboard cruise ships that render the risk of viral contagion especially dangerous and likely, and, based on their experience with COVID-19 aboard the DIAMOND PRINCESS only 3 weeks prior to the instant voyage on the M/V GRAND PRINCESS, Defendants knew or should have known that exposure to

1   COVID-19 was threatening to passengers'—including Plaintiffs—lives and well-
2   being.

3        346.   Defendants also knew or should have known that passengers aboard
4   the San Francisco-to-Mexico trip on the M/V GRAND PRINCESS had experienced
5   symptoms of COVID-19, were eventually diagnosed with COVID-19, and that
6   those passengers remaining onboard for the Hawaii trip had been exposed and were
7   likely carriers of the virus.

8        347.   By or before the time of boarding passengers onto the M/V GRAND
9   PRINCESS, on February 21, 2020, Defendants knew or should have known of the
10  extreme risks to health and safety—including the possibility of death—presented by
11  COVID-19.

12       348.   In light of this knowledge and experience, and particularly given that,
13  *first*, cruise ships present an especially heightened risk of contagion and, *second*,
14  that once they have boarded, Passengers have no option of disembarking while the
15  ship remains at sea, Defendants exhibited extreme and outrageous conduct when,
16  *inter alia*, Defendants boarded Plaintiffs and the Class onto the M/V GRAND
17  PRINCESS on February 21, 2020, for the Hawaii-bound trip without taking any
18  effective measures to medically screen or examine passengers for COVID-19
19  symptoms.

20       349.   Defendants additionally acted extremely and outrageously when they
21  chose not to effectively clean, sanitize, sterilize, or disinfect the M/V GRAND
22  PRINCESS in between the Mexico trip and the Hawaii trip. Furthermore,
23  Defendants' decision to allow Plaintiffs and the Class to embark upon a voyage, on
24  an ineffectively sanitized ship, with passengers and crew members who had been
25  exposed to COVID-19 constituted extreme and outrageous conduct.

26       350.   Defendants' decision to ignore recent protocols and recommendations
27  issued by public health experts and experts in the cruise industry by not
28  disembarking crew members and passengers who had been exposed to COVID-19

THIRD AMENDED COMPLAINT
No. 2:20-cv-04203-RGK

1  on the M/V GRAND PRINCESS's first voyage between San Francisco and Mexico

2  was extreme and outrageous conduct.

3       351.   Defendants exhibited repeated and continued extreme and outrageous

4  conduct when, during the San Francisco-to-Hawaii voyage upon the M/V GRAND

5  PRINCESS, prior to March 4, 2020, Defendants failed to: alert Plaintiffs to the fact

6  that at least one passenger on the prior voyage had been diagnosed with COVID-19

7  and had come into contact with passengers and crew members currently on the ship;

8  notify Plaintiffs and the Class about the actual and potential threat of exposure to,

9  infection of, and the possibility of spreading, COVID-19 aboard the ship; failed to

10  advise Plaintiffs and the Class about the possibility and health benefits of

11  disembarking during the trip, at one of the vessel's ports of call.

12       352.   Defendants continued to behave extremely and outrageously when

13  they:  encouraged Plaintiffs and the Class to continue mingling and participating in

14  large group events and functions throughout the duration of the trip; continued to

15  provide turn down service to passengers despite the fact that over 1,000 crew

16  members had been exposed to COVID-19 on the Mexico trip; and failed to institute

17  any policies for quarantine, isolation, or social distancing for passengers until

18  March 4, 2020.

19       353.   The acts and omissions described herein not only failed to protect

20  Plaintiffs from exposure to and contraction of COVID-19, but likely exacerbated

21  the spread of the virus among the passengers, including Plaintiffs and the Class,

22  ultimately enlarging the threat and harms to Plaintiffs and the Class.

23       354.   As a direct and proximate result of Defendants' intentional and

24  reckless behavior and omissions, Plaintiffs and the Class suffered severe emotional

25  distress and physical harm.

26       355.   Plaintiffs and the Class were forced to watch as their friends and

27  family members became ill with COVID-19, and, all the while, know that their own

28  safety and well-being were at extreme risk. Plaintiffs suffered physical and

1    emotional injury as the direct and proximate result of Defendants' misconduct, and

2    Plaintiffs continue to suffer from anxiety and the reasonable apprehension that they

3    may still begin exhibiting symptoms or experience as-yet-unidentified

4    complications due to their exposure to and potential contraction of COVID-19

5    while aboard the M/V GRAND PRINCESS.

6        356.   As a direct and proximate result of Defendants' extreme departure

7    from the ordinary standard of care and their failure to meet their duties of care to

8    Plaintiffs and the Class by providing even scant care, Plaintiffs experienced

9    physical harms in the form of COVID-19-associated symptoms and negative health

10   outcomes as described in paragraphs 169 through 201.

11       357.   Finally, as a direct and proximate result of Defendants' behavior,

12   which exposed Plaintiffs and the Class to COVID-19 and to actual risk of

13   immediate physical injury, Plaintiffs and the Class have suffered emotional distress

14   of the nature and type that reasonable persons would suffer under the circumstances

15   alleged in this Complaint, including, but not limited to, suffering, anguish, fright,

16   horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame related to

17   their own exposure to COVID-19 and the suffering they witnessed among their

18   fellow passengers who contracted COVID-19. Plaintiffs and members of the class

19   were traumatized by the reasonable apprehension of their family members, friends

20   and fellow passengers developing COVID-19 and by the past and ongoing threat to

21   their own health of becoming infected with the virus and potentially suffering from

22   as-yet-unidentified negative health outcomes and complications.

23       358.   Plaintiffs and Class members were endangered and harmed by

24   Defendants' actions when they were forced into confinement on an infected vessel

25   in isolation. That danger and harm continued when they were confined at federal

26   facilities, including Travis Air Force Base, for approximately two weeks, as a result

27   of the threat of viral outbreak created by Defendants' actions. It is expected that

28   Plaintiffs and the Class will continue to suffer and will, in the future, require

medical services not of a kind generally accepted as part of the wear and tear of daily life.

359.   Throughout the events described in this Complaint, Defendants repeatedly acted with conscious, callous, and/or reckless disregard for the rights, interests, health and safety of their passengers, such that the imposition of punitive damages, under CA Civil Code Section 3294 and/or all other applicable law, is necessary and appropriate to punish them for their course of conduct, and to deter them and others, and protect the public, from the consequences of similar conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, and all others similarly situated, pray for judgment against Defendants, and each of them, as follows:

1.   An order certifying the proposed Class pursuant to Fed. R. Civ. P. Rule 23(a) and (b)(1), (b)(2), (b)(3) and/or (c)(4), designating Plaintiffs ROBERT ARCHER, MARLENE ARCHER, PAMELA GIUSTI, MICHAEL GIUSTI, JACQUELINE GRAHAM, ROBERT GRAHAM, VALERIE PASQUINI WILLSEA, MICHAEL R. NEKY, GINA M. PALLOTTA, JOSEPH CLARK, VIOLA CLARK, RAUL PANGILINAN, DENCY PANGILINAN, AMY ROTHMAN, JORDAN BLYNN, JOSEPH BALLIN, VICTORIA BALLIN, DAVID LEANDRES, and DIANNE LEANDRES as named representatives of the Class and designating the undersigned as Class Counsel;

2.   An award of damages totaling in excess of Five Million Dollars ($5,000,000.00), inclusive of compensatory damages for Plaintiffs' injuries, including emotional pain and suffering and any other damages allowed by law, in an amount to be proven at trial;

3.   An award of the costs associated with the ongoing medical monitoring and diagnostic examinations required to diagnose, prevent, and/or treat current or future injury related to Plaintiffs' and Class Members' exposure to, illness and disease caused by, and contraction , asymptomatic contraction, and/or potential contraction of

COVID-19, in light of the evolving scientific understanding of the full risk and scope of health outcomes related to and / or resulting from the virus;

4.      An injunction requiring Defendants to: disclose to future passengers the nature and rate of risk of communicable disease upon their cruise ships; implement disinfecting and sanitizing procedures on each of their ships in between and during voyages; implement appropriate social distancing and physical distancing protocols to avoid or reduce the transmission of communicable pathogens; disembark and quarantine passengers when Defendants become aware of a heightened risk of communicable disease aboard a ship; and canceling or discontinuing the operation of cruises when Defendants know or should know of a potential deadly pathogen or similar aboard their ships;

5.      An award of attorneys' fees and costs, as allowed by law;

6.      An award of pre-judgment and post-judgment interest, as provided by law;

7.      Leave to amend this Complaint to conform to the evidence produced at trial; and

8.      For such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated:     October 2, 2020          NELSON & FRAENKEL LLP


By:  */s/ Gretchen M. Nelson*

Gretchen M. Nelson (112566)
gnelson@nflawfirm.com
Carlos F. Llinás Negret (284746)
cllinas@nflawfirm.com
601 So. Figueroa Street, Suite 2050
Los Angeles, CA 90017
Telephone:  213-622-6469
Facsimile:  213-622-6019


Dated:     October 2, 2020          MARY ALEXANDER & ASSOCIATES, P.C.


By:  */s/ Mary E. Alexander*

Mary E. Alexander, Esq. (SBN 104173)
*malexander@maryalexanderlaw.com*
Brendan D.S. Way, Esq. (SBN 261705)
*bway@maryalexanderlaw.com*
44 Montgomery Street, Suite 1303
San Francisco, California 94104
Telephone: (415) 433-4440
Facsimile: (415) 433-5440

THIRD AMENDED COMPLAINT
No. 2:20-cv-04203-RGK

| | | |
|---|---|---|
| 1 | Dated: | October 2, 2020 |
| 2 | | |

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP


By:  */s/ Elizabeth J. Cabraser*

Elizabeth J. Cabraser (SBN 083151)
*ecabraser@lchb.com*
Jonathan D. Selbin (SBN 170222)
*jselbin@lchb.com*
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Mark P. Chalos (*Pro Hac Vice*)
*mchalos@lchb.com*
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
Facsimile: (212) 313-9965

*Attorneys for all Plaintiffs*

Dated:     October 2, 2020          SAUDER SCHELKOPF LLC


By:  */s/ Joseph G. Sauder*

Joseph G. Sauder (*Pro Hac Vice*)
*jgs@sstriallawyers.com*
1109 Lancaster Avenue
Berwyn, PA 19312
Telephone: (888) 711-9975
Facsimile: (610) 421-1326

*Attorney for Plaintiffs Joseph Ballin
and Victoria Ballin*

- 83 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I, Elizabeth J. Cabraser, hereby certify that on October 2, 2020, I caused to be electronically filed **THIRD AMENDED CLASS ACTION COMPLAINT FOR DAMAGES** with the Clerk of the United States District Court for the Central District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser

- 84 -

THIRD AMENDED COMPLAINT
No. 2:20-cv-04203-RGK